**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**

**TODD, C.J., DONOHUE, DOUGHERTY, WECHT, MUNDY, BROBSON, McCAFFERY, JJ.**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 813 CAP |
| | : | |
| Appellee | : | Appeal from the Order entered on |
| | : | December 29, 2023, in the Court of |
| | : | Common Pleas of Bucks County, |
| v. | : | Criminal Division, at No. CP-09-CR- |
| | : | 0001413-2014. |
| | : | |
| MARCEL EMANUEL JOHNSON, | : | SUBMITTED:  February 26, 2025 |
| | : | |
| Appellant | : | |

**OPINION**

**JUSTICE WECHT**                                              **DECIDED: March 26, 2026**

Marcel Emanuel Johnson was convicted by a jury of killing Ebony Talley (first-degree murder[1]), her unborn child (third-degree murder[2]), and her four-year-old daughter, R.R. (first-degree murder), as well as other associated offenses.[3]  He was sentenced to death for R.R.'s murder.  On direct appeal, this Court affirmed his judgment of sentence.[4]  Now before this Court is Johnson's appeal of the Court of Common Pleas' denial in its

---

[1]    18 Pa.C.S. § 2502(a) ("A criminal homicide constitutes murder of the first degree when it is committed by an intentional killing.").

[2]    *Id*. § 2502(c) ("All other kinds of murder shall be murder of the third degree.").

[3]    Johnson also was convicted of arson endangering persons, *id*. § 3301(a), and possessing instruments of crime, *id*. § 907.

[4]    *Commonwealth v. Johnson*, 160 A.3d 127 (Pa. 2017).

entirety of Johnson's timely first petition under the Post Conviction Relief Act ("PCRA").[5] We affirm.

## I. Background

For reasons that will become clear, we segregate the circumstantial evidence supporting Johnson's convictions in this case from certain evidence that comes under challenge in Johnson's PCRA claims. This is necessary because our analysis of the issues in this case requires us to consider whether, with problematic evidence excluded, there is a reasonable probability that the outcome of the trial would have been different. Accordingly, we begin with the trial court's account, as sustained by the trial record, with the contested evidence excised. Afterward, we review the challenged evidence. Our analysis of the issues follows.

### A. The Circumstantial Case for Guilt

The trial court's detailed account, limited to the circumstantial evidence and modestly abridged, is as follows:

> On Monday, November 25, 2013, at approximately 3:30 p.m., Bristol Township Police were dispatched to a reported fire in Building 600 of the Avalon Court Apartments located in Bristol Township, Bucks County. Officer Joseph Dragon was the first emergency responder to arrive at the scene. Upon his arrival, he was advised by employees of the apartment complex that a child might be trapped in one of the basement level apartments. Officer Dragon then entered the building and proceeded down to the basement level. He was prevented from entering the common hallway on that floor due to the presence of thick, heavy smoke. Two firefighters, who arrived in advance of the emergency equipment, identified Apartment 604, located on the basement level of the building, as the location of the fire and also attempted entry. They too were forced to retreat due to the dense smoke and heat.

---

[5] *See* 42 Pa.C.S. §§ 9541-9546. The PCRA "provides for an action by which persons convicted of crimes they did not commit and persons serving illegal sentences may obtain collateral relief." *Id*. § 9542.

Entry into Apartment 604 was made shortly after the first fire engine arrived. After entering the apartment, firefighters proceeded to a bedroom located in the rear of the apartment. There, they observed the bed and piles of clothes burning. Once that fire was extinguished, firefighters found the body of a deceased female lying face-down on the bedroom floor. Her head and neck were encased in a blue plastic bag. This victim was identified as twenty-two-year-old Ebony Talley. Talley was five months pregnant at the time of her death. Firefighters found Talley's four-year-old daughter, R.R., on the floor in the living room lying beneath an overturned couch. R.R. was rushed to St. Mary Medical Center where she was pronounced dead.

\* \* \* \*

The [autopsy] of Talley's body revealed thirty-five knife wounds . . . . One of the stab wounds penetrated her uterus and punctured the amniotic sac. Defensive wounds were found on her arms and on her left hand. Talley also suffered a blunt impact injury to her mouth, causing her to lose two teeth. One tooth was found in her mouth at the autopsy. The other was found at the crime scene on the floor in between the kitchen/dining area and the living room of the apartment. [Pathologist Ian Hood] testified that the injury was consistent with Talley having been struck in the face with the frying pan found near her body at the scene. . . . The cause of death was determined to be multiple stab wounds. Dr. Hood testified that he could not exclude terminal asphyxiation, caused by the plastic bag being placed over her head, as the final mechanism of death. Fingernail scraping[s] taken from Talley at the autopsy were submitted for DNA analysis. The scrapings contained male DNA.

The twenty-week male fetus Talley was carrying, otherwise healthy and uninjured, died as a result of the death of his mother.

The Commonwealth's arson expert . . . testified that two fires were set inside the apartment; one in the back bedroom next to the body of Talley, the other in the living room next to where R.R. lay dying. He testified that the fires were intentionally set by application of an open flame to two separate fuel sources, clothing and a cushioned chair in the bedroom and a potholder in the living room. Cooking oil was poured throughout the scene. It was found at both points of origin and on the victims' clothing.

Talley lived with her daughter in Apartment 604 of Avalon Court Apartments.[6] Johnson used her apartment to shower and change clothes. He also stored his personal property there. At the time of her death, Talley

---

6    Talley's was subleasing the apartment from an acquaintance, Gisele Ucci, who was on a lengthy trip in Argentina. Talley also had use of Ucci's Cadillac, which plays a role in this case. For purposes of this narrative we refer to both as Talley's.

was selling heroin out of that apartment. Johnson, an accomplice in Talley's drug dealing activities, knew that she sold heroin. . . . Johnson had . . . told his girlfriend, Natashia Martinez, that he had to do something to make money. The night before she was murdered, Talley asked her boyfriend, Eric Nawuoh, to tell Johnson that he had to "leave." Nawuoh did as she requested.

On the morning of the murders, Talley, R.R., Talley's mother, her two sisters, Nawuoh and Johnson were at the victims' apartment. Nawuoh left the apartment before noon. Talley's mother and sisters left at approximately 2:30 in the afternoon, leaving Talley and R.R. alone with Johnson. When he was last seen by the victims' family, Johnson was wearing dark clothing, a black or blue hoodie, dark pants and dark shoes.

At approximately 2:30 that afternoon, maintenance man Joseph Casey saw R.R. playing outside with a dog. Seeing that she was alone, he told her to go back inside. At that time, he noted that Talley's burgundy Cadillac was parked in front of Building 600. At approximately 3:00 p.m., Casey observed smoke in Building 600. After calling the fire department, he and his co-workers attempted to enter the hallway to the ground floor apartments where the victims resided but were prevented from doing so as black smoke began filling the hallway. When he went back outside, Casey noticed that the Cadillac was gone and immediately notified police of its absence.

Just minutes before police and fire crews arrived, area resident, Nigeria Gary, was sitting in her vehicle in the parking lot of the Avalon Court Apartments when she observed the burgundy Cadillac quickly reverse out of its parking space, strike a parked car and speed out of the apartment complex. At approximately 3:27 p.m., a local video surveillance camera captured the vehicle as it traveled away from Avalon Court Apartments, in the direction of Levittown Trace Apartments.

At approximately 5:30 p.m., a resident of Levittown Trace Apartments, Jill Connolly, observed the burgundy Cadillac drive into the parking lot of Levittown Trace Apartments. After the car entered the lot, the headlights were switched off, the car reversed and proceeded to the rear of H Building. Approximately three minutes later, Connolly observed Johnson walk from that location towards the entrance of F Building.

Johnson thereafter unexpectedly arrived at the apartment of Jina Padilla, located in F Building of Levittown Trace Apartments. He was wearing a blue sweater, jeans and a red and black hat. He appeared to be "very worried" and "very panicky" and immediately asked to use Padilla's cell phone. After Padilla agreed to let him use her phone, Johnson took the phone into her bedroom to make his call(s) in private. After using the phone, Johnson asked Padilla if he could leave a bag at her apartment. She refused his request. Johnson, who was at Padilla's apartment for

approximately thirty minutes, used the bathroom before leaving. He was in the bathroom for five to ten minutes.

While police and fire crews were still on scene, Brittany Coles, Talley's cousin, received multiple cell phone calls from Johnson at five to ten minute intervals. During those calls, Coles told Johnson that the apartment was on fire, that R.R. might be in the apartment, that Talley could not be located and, ultimately, that R.R. had been rushed to the hospital. Coles asked Johnson to return to the apartment to find out what was happening. Although Johnson admitted that he was at Levittown Trace Apartments, less than a mile from the scene, and that he had Talley's car and her Xbox, he refused Coles' request for help. Talley's sister, Paulina Burke, also received calls from Johnson while he was at Levittown Trace Apartments. Burke told Johnson that there was a fire at the apartment and that the family was being told that Talley and R.R. were killed. She told him that she and the family were at the police station and that he needed to come to the station as well. Johnson, who was less than half a mile from the police station, refused to cooperate.

Based on this information, investigators proceeded to Levittown Trace Apartments. In several common areas of the complex, they found belongings of Johnson that had been stored in Talley's apartment prior to the murders. At 6:20 p.m., police located Talley's burgundy Cadillac behind H Building, a secluded area of the complex. Police kept the car under surveillance until 7:08 p.m., at which time Johnson got into the car and began to drive away. Police immediately stopped the car. Johnson, the sole occupant of the vehicle, was no longer wearing the clothing he had worn earlier in the day. He had fresh injuries to his right hand. A bottle of Clorox bleach was found on the right rear passenger floor of the car.

At 7:37 p.m., Johnson agreed to speak with investigating detectives. During that interview, Johnson admitted that he knew Talley was pregnant. He admitted that he had been at Talley's apartment earlier in the day. He stated that he left the apartment because Talley asked him to leave. He initially claimed that after leaving the apartment, he walked to a local Burger King and that, while there, he contacted a friend he identified as "Eric Stahl" who, Johnson said, arrived at the Burger King driving the victim's Cadillac. Johnson stated that he and Stahl then drove to Levittown Trace Apartments. He claimed that Stahl gave him the keys to the car and left on foot. Johnson claimed that he then tried to enter H Building and that when he could not do so, he returned to the car, began to drive and was then immediately stopped by police. After being advised that there were numerous surveillance systems in the area of the Burger King where Johnson claimed to have met Stahl, Johnson admitted that he had taken the victim's car from the Avalon Court Apartments, and that, while doing so, he hit a parked car and left at a high rate of speed. Johnson admitted that Talley's sister had urged him to come to the police station and that he refused to do so. His excuse for

refusing to assist the victims' family and investigators was that he had outstanding non-traffic summary citation warrants for sleeping in a vehicle. He later stated that he did not want to get involved and that, "It was every man for himself." During the course of the interview, Johnson was shivering, shaking and sweating.

While Johnson was at the police station, the investigating detectives executed a search warrant issued for Johnson's person. Buccal swabs and fingernail scraping[s] were taken from Johnson at that time. DNA analysis of the scrapings from Johnson's right hand revealed the presence of Talley's DNA. Johnson's DNA was compared with DNA obtained from various pieces of evidence. . . .[7]

In the area between the kitchen and living room of the crime scene, police found large blood stains, Talley's tooth, one earring which matched the earring found on Talley's body and a wireless Xbox controller to Talley's Xbox which Johnson had in his possession immediately after the murders. In that same area, police found a personalized dog tag inscribed "Tashia loves you forever." Johnson's girlfriend, Natashia Martinez, testified that the dog tag belonged to Johnson and that Johnson always wore that dog tag. Johnson's cell phone was also found at the crime scene.[8] Images of Johnson wearing that dog tag were downloaded from that phone.[9]

Even this account, while thorough, leaves out a handful of items of circumstantial evidence that further incriminated Johnson. For instance, Detective Jack Slattery testified that, during the police station interview of Johnson, without any prompting, Johnson raised the prospect of cooking grease as a fire hazard present in the apartment:

> Q. Do you know—did you either question [Johnson] or did he say anything about the burners on the stove and pots of grease?

---

[7]     Omitted here is reference to a partial match with DNA obtained from a frying pan handle found near Talley's body, with the pan, itself, found nearby. Talley was missing two teeth; one was found in her mouth, the other on the floor near her body. As discussed below, the quality and relevance of the supposed partial match is very much in question, hence its omission from this portion of our factual recital.

[8]     The testimony established that Johnson made the aforesaid phone calls from phone numbers unfamiliar to the recipients, who knew Johnson's personal number.

[9]     Tr. Ct. Op., 3/23/2016, at 1-9 (names modified; citations to notes of testimony and exhibits omitted).

A. Once the fire was disclosed by him, the knowledge that there had been a fire in apartment 604 was disclosed by him, not by us, he almost seemed to be making excuses as to why this fire would have happened accidentally.

\* \* \* \*

He began to explain that [Talley] would leave a burner on the stove on in the apartment as a source of heat, and that she would leave pots or pans of grease or oil right next to the open flame. And he began to tell us that this is something that he tried to address with her, that he had told her about this, that it was dangerous.

Q. So he mentioned pots of grease to you?

A. He did.

Q. Was that before you had even—did you ever say anything to him about the grease?

A. No. To be clear, at the time I was unaware that grease was an issue. I had never set foot inside the scene.[10]

Undisputedly, the fire did not start in the kitchen.

Furthermore, the instances of Johnson's shifting story reviewed by the trial court alone were not the only ones. For example, Johnson's explanation as to what prompted him to contact Talley's cousin, Brittany Coles, shortly after leaving Avalon Court was inconsistent:

Q. . . . Did he say that he knew whether Brittany Coles was related to [Talley]?

A. He did. He told us that he was aware that Brittany Coles was [Talley's] cousin.

Q. Did you ask him about that phone call?

A. Yes. An obvious question that Detective Fuhrmann and I had would have been why he thought it was necessary to contact Brittany Coles, [Talley's] cousin; if it was just out of the blue or if there was a purpose behind it. What he explained to us initially was that he had saw police and fire

---

[10] Notes of Testimony at Trial ("N.T.T."), 5/29/2015, at 287-88.

personnel responding to Avalon Court. He quickly changed that and said that he didn't see them actually responding, but he saw them going in the direction of Avalon Court.

> And then this next part was confusing to me. He saw that the police department responded to a subject that he knew in the Levittown Trace Apartments, and that caused him some concern for something in Avalon Court.[11]

On direct appeal, this Court noted additional evidence regarding details of the burgundy

Cadillac and its contents:

> [Investigators] noticed that the [Cadillac's] license plate had been changed, but the VIN number, which is visible through the windshield, verified that it was Talley's vehicle. . . . A subsequent search of Talley's vehicle revealed, among other items, a bundle of eight empty wax packets stamped in red with "# 1 way to go," in the ash tray. These packets were identical to the packets found around Talley's body and in her bedroom.[12]

Finally, this Court summarized the procedural history:

> The police arrested Johnson that evening on charges of possession of drug paraphernalia based on items found in his possession when the police stopped him in Talley's vehicle. . . .

> In January 2014, Johnson was charged with the murders of Talley, R.R., Talley's unborn child and related crimes.

> * * * *

> A jury trial commenced in May 2015, at the conclusion of which Johnson was convicted of the first-degree murders of both Talley and R.R., third-degree murder of Talley's unborn child, arson (endangering people), and possessing instruments of crime.[13]

---

[11] *Id*. at 289.

[12] *Johnson*, 160 A.3d at 135.

[13] *Id*. (footnote omitted)

## B. The Other Evidence of Guilt

The trial court also summarized additional evidence that is the subject of the legal issues raised by Johnson in his PCRA petition and before this Court on appeal:

> Within days of the murders, Johnson made a number of statements at the Bucks County Correctional Facility ["BCCF"] to a fellow inmate [George Lewis]. Johnson told Lewis, "She made me kill her." Lewis asked, "Who?" Johnson responded, "Ebony." Johnson further stated that he had "killed the baby." Johnson explained that he "had to stab her" because she was "very smart and she can identify me." Johnson told Lewis that he stabbed "the baby" in the upper chest and that he "put the baby on fire" and then fled the scene.
>
> Johnson also spoke to his brother, Marquis Johnson, by telephone from the prison. During one recorded conversation, Johnson directed Marquis to retrieve "evidence" that Johnson said he had hidden in a box on the wall of a laundry room in F Building of Levittown Trace Apartments. [Marquis] went to that location and retrieved a blue latex glove containing small yellow bags and a money order. Johnson's brother cashed the money order and hid the glove containing the packets in a crawl space in his home.
>
> Police later retrieved the glove and determined that it contained 167 small yellow packets of heroin. The 167 yellow heroin packets were stamped with a red "#1" with "way to go" printed inside the number. Empty yellow packets containing the same stamp were found at the crime scene scattered on the floor near the body of Talley, in a shoe box found in the bedroom where her body was found, in the living room of the apartment and in the Cadillac. The glove also contained a clear plastic bag. Eleven identical clear plastic bags were found on Johnson's person when he was stopped by police the day of the murders. Johnson's DNA was found on that glove.[14]

The money order that Marquis retrieved from the box found at Levittown was for "[a]bout $80,"[15] which corresponded to the amount of the money order that Talley obtained the morning before she was killed.[16]

---

[14] Tr. Ct. Op., 3/23/2016, at 9-10 (names modified; citations to notes of testimony and exhibits omitted).

[15] N.T.T., 6/1/2015, at 70.

[16] *See* N.T.T., 5/27/2015, at 111 (Talley's mother, Pearline Burke, testified that the morning before the killing she rode with Talley to get a money order for $80).

The confession to Lewis was the only direct evidence of Johnson's guilt introduced at trial. And the lead prosecuting attorney, ADA Matthew Weintraub, characterized Johnson's confession as the "linchpin" of his case (and other words to similar effect).[17]

Also admissible but at issue herein was the Commonwealth's DNA evidence. That evidence as presented arguably was broadly favorable to Johnson because there was very little DNA evidence implicating him in the murders. But it wasn't all favorable. The Commonwealth's DNA expert, Dr. Alex Glessner, testified that genetic material found under Johnson's fingernails matched Talley's DNA, and that her DNA would only be found under Johnson's nails as a consequence of intimate contact.[18] Trial counsel did nothing to undermine this conclusion either in cross-examination or with the assistance of a DNA expert for the defense, despite the fact that counsel consulted an expert who discerned numerous flaws in the Commonwealth's expert's methods and conclusions. The article that the Commonwealth's expert cited in support of his conclusion contradicted the proposition that *only* intimate contact could have resulted in the DNA match. Rather, the article indicated that genetic material could have found its way under Johnson's nails through co-occupancy of an apartment with Talley. Dr. Glessner admitted as much at a

---

[17]　*See*, *e.g.*, Notes of Testimony at PCRA Hearing ("N.T.P."), 6/28/2023, at 112-13 (ADA Weintraub describing counsel's use of "linchpin" as "literally true" and adding that Lewis was "very important" and "critical to the case").

[18]　*See* N.T.T., 5/29/2015, at 179 ("DNA that does not belong to the person whose fingernails they are under, it needs to be more than just casual contact. So you need to have some kind of intimate contact with another person to deposit enough DNA under your fingernails to render a test result at the end showing more than one person.").

later PCRA hearing.[19] The evidence indicated that Johnson spent significant time in Talley's apartment and perhaps sometimes stayed the night.

### C. The Penalty Phase

This Court summarized the penalty-phase evidence on direct appeal:

> During the penalty phase, the Commonwealth presented evidence of four aggravating factors as to Talley: torture; conviction of another murder at the same time of Talley's murder; involvement in the sale of narcotics at the time of the murder; and knowledge of Talley's pregnancy.[8] N.T.T., 6/8/2015, at 192-95. The Commonwealth pursued three aggravating factors with regard to R.R.: that R.R. was a witness to a murder and was killed to prevent her from testifying; conviction of another murder at the same time as R.R.'s murder; and that R.R. was less than twelve years old.[9] *Id.* at 197-200.
>
> > [8] 42 Pa.C.S. §§ 9711(d)(8), (11), (13), (17).
> >
> > [9] *Id*. §§ 9711(d)(5), (11), (16).
>
> Johnson presented evidence in support of four mitigating factors: his lack of a significant history of prior criminal convictions; extreme mental or emotional disturbance at the time of the murders; and the fact that he was twenty-one at the time of the murders.[10] *Id.* at 200. Johnson also presented an assemblage of evidence under the catchall mitigating factor, 42 Pa.C.S. § 9711(e)(8), including evidence that Johnson's life up until the time of the murders was characterized by chronic and pervasive abuse, neglect and abandonment; that he suffered brain damage and had been diagnosed with various mental illnesses; cycles of placement in and out of treatment programs; and a complete lack of any semblance of stability or permanence. The jury ultimately sentenced Johnson to death for R.R.'s murder and life in prison for Talley's murder.
>
> > [10] *Id*. §§ 9711(e)(1), (2), (4).[20]

---

[19]     *See* N.T.P., 8/10/2023, at 132-33.

[20]     *Johnson*, 160 A.3d at 135-36 (some footnotes omitted; some citations modified).

## D. Direct Appeal

On direct appeal this Court considered (among other things omitted from this account) the sufficiency of the evidence as a matter of course.[21] Next, the Court considered and rejected various challenges to the trial court's refusal to suppress evidence at trial. Additionally, Johnson challenged the trial court's admission of Marquis' testimony that, shortly before the murders, Johnson asserted in conversation with Marquis that Johnson was "willing to do anything to make a come up,"[22] which Marquis indicated was a way of signaling Johnson's ambitions to improve his situation economically.

The Court then turned to issues raised by Johnson relative to the penalty phase of his trial. First, this Court considered and rejected Johnson's assertion that the trial court wrongfully excluded his mitigation expert's testimony regarding a multi-generational history of abuse, poverty, drug abuse, and mental illness. That court had deemed such evidence relevant only to the extent that it "was somehow made part of the family structure or . . . was made known to [Johnson], and therefore could be said to have had an impact upon him."[23] Correlatively, the trial court had excluded the subset of such evidence for which Johnson was not present, or of which he was never made aware.

---

[21] On direct appeal of a capital conviction, this Court considers the sufficiency of the evidence regardless of whether the defendant raises a sufficiency challenge. *See Johnson*, 160 A.3d at 136 (citing *Commonwealth v. May*, 887 A.2d 750, 753 (Pa. 2005)).

[22] *Id*. at 145 (quoting N.T.T., 6/1/2015, at 63-64). In testimony excerpted by this Court in the same connection, Marquis elaborated that Johnson "said that if you have to shoot someone to make a come up or be involved in anything to make that come up, he will do so." N.T.T., 6/1/2015, at 64.

[23] *Johnson*, 150 A.3d at 147.

Finally, fulfilling another obligation of this Court that is peculiar to capital direct appeals, this Court tested the imposition of the death penalty for bias engendered by passion, prejudice, or another arbitrary factor, as well as for the sufficiency of the evidence of the aggravating factors found by the jury.[24] The evidentiary basis for the aggravators was ample, and this Court found that the sentence was not the result of any arbitrary factor.

For all these reasons and others, this Court affirmed the conviction and judgment of sentence.

## II. Legal Standards

This case comes before us now on collateral review under the PCRA, which "provides for an action by which persons convicted of crimes they did not commit and persons serving illegal sentences may obtain collateral relief."[25] Relevant to this case, Johnson can establish a right to PCRA relief if he pleads and proves by a preponderance of the evidence that he has been convicted of a crime in Pennsylvania and is awaiting execution of a sentence of death for that crime, and that his conviction resulted from one or more of the following:

> (i) A violation of the Constitution of this Commonwealth or the Constitution or laws of the United States which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place.

> (ii) Ineffective assistance of counsel which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place.

---

[24]    *See id.* at 153.

[25]    42 Pa.C.S. § 9542.

* * * *

(vi) The unavailability at the time of trial of exculpatory evidence that has subsequently become available and would have changed the outcome of the trial if it had been introduced.[26]

Additionally, Johnson must prove that his issues have not been previously litigated or waived because he failed to raise them at the earliest time he could.

An issue has been previously litigated if the highest appellate court in which the petitioner was entitled to review as a matter of right has ruled on the merits of the issue. . . . A PCRA claim is waived "if the petitioner could have raised it but failed to do so before trial, at trial, during unitary review, on appeal or in a prior state post[]conviction proceeding."[27]

"On appeal from the denial of PCRA relief, our standard of review calls for us to determine whether the ruling of the PCRA court is supported by the record and free of legal error."[28] We review questions of law *de novo*, and "our scope of review is limited to the PCRA court's findings and the evidence of record, viewed in the light most favorable to the Commonwealth as the prevailing party."[29]

### III. PCRA Proceedings

These proceedings commenced when Johnson filed a timely *pro se* PCRA petition on January 9, 2018. Present counsel filed an amended PCRA petition on Johnson's behalf on July 15, 2019. The Commonwealth responded with an "Answer and Memorandum of Law in Opposition to Johnson's Petition." Various other motions followed, including a Motion for an Evidentiary Hearing, which the PCRA court granted.

---

[26] 42 Pa.C.S. § 9543(a)(2).

[27] *Commonwealth v. Washington*, 927 A.2d 586, 593-94 (Pa. 2007) (quoting 42 Pa.C.S. § 9544(b)) (cleaned up).

[28] *Id*. at 593.

[29] *Commonwealth v. Chmiel*, 173 A.3d 617, 625 (Pa. 2017).

The PCRA court held evidentiary hearings from June 28 through June 30, 2023, and again on August 9 and August 10, 2023. In November 2023, Johnson moved to amend his PCRA petition, and the PCRA court granted the motion. An amended petition and additional filings followed. The PCRA court denied Johnson's final amended petition on December 29, 2023, and Johnson filed the instant, timely appeal in this Court. The PCRA court issued its Pa.R.A.P. 1925(a) opinion on April 5, 2024.

### IV. Guilt Phase Issues and Analysis

### A. The Issues and the Necessity of Prejudice

As noted, *supra*, Johnson cannot establish a basis for relief under the PCRA unless he establishes that the trial deficiencies asserted "so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place."[30] As well, under the guises of both "materiality" and "prejudice," this question—the likely effect of the error on the outcome of the trial—pertains individually to all of the specific assertions of error raised by Johnson in this case. Importantly, with respect to claims of constitutional ineffectiveness of counsel, this Court has held that, "[w]hen the failure of individual [constitutional ineffectiveness of counsel] claims is grounded in lack of prejudice, then the cumulative prejudice from those individual claims may properly be

---

[30] 42 Pa.C.S. §§ 9543(a)(2)(i), (ii); *cf. id.* § 9543(a)(2)(vi) (providing for collateral relief based upon "[t]he unavailability at the time of trial of exculpatory evidence that has subsequently become available *and would have changed the outcome of the trial if it had been introduced*" (emphasis added)).

assessed."[31]  Thus, "a new trial may be awarded due to cumulative prejudice accrued through multiple instances of trial counsel's ineffective representation."[32]

In the order presented, Johnson presents the following challenges to the conduct and outcome of his guilt-phase trial:

(1) that the prosecution violated its obligation to disclose exculpatory or witness impeachment evidence under *Brady v. Maryland*;[33]

(2) that the prosecution failed to correct the false trial testimony of its primary witness, George Lewis, a jailhouse informant who claimed that Johnson confessed to him the killings at issue in this case;

These two issues implicate both materiality and prejudice.  "It is well-settled that *Brady* and subsequent precedent flowing therefrom impose[] upon a prosecutor the obligation to disclose all favorable evidence that is material to the guilt or punishment of an accused . . . ."[34]  Relief for a *Brady* violation is due when a court determines that "the evidence was material, meaning that prejudice must have ensued."[35]  Relatedly, the knowing and willful failure to correct false testimony implicates due process protections. Such a violation requires relief if there is "any reasonable likelihood" that the uncorrected testimony could have "affected the judgment of the jury."[36]

---

[31]    *Commonwealth v. Spotz*, 18 A.3d 244, 321 (Pa. 2011).

[32]    *Id*. at 321 (describing our holding in *Commonwealth v. Perry*, 644 A.2d 705, 709 (Pa. 1994)).

[33]    373 U.S. 83 (1963).

[34]    *Commonwealth v. Bagnall*, 235 A.3d 1075, 1085-86 (Pa. 2020) (citing *Commonwealth v. Strong*, 761 A.2d 1167, 1171 & n.5 (Pa. 2000)).

[35]    *Id*. at 1086.

[36]    *Giglio v. United States*, 405 U.S. 150, 154 (1972) (quoting *Napue v. Illinois*, 360 U.S. 264, 271 (1959)).

The next four issues that Johnson raises involve allegations of constitutionally ineffective assistance of trial counsel, Craig Penglase and John Fioravanti.[37] They are as follows:

(3) that trial counsel was constitutionally ineffective for failing to sufficiently investigate Lewis' putative history of trading cooperation with investigators, including allegedly false jailhouse confessions, for favorable treatment, and to use this information to impeach Lewis' trial testimony;

(4) that trial counsel "was ineffective for failing to understand, investigate and impeach the Commonwealth's DNA evidence";[38]

(5) that trial counsel failed to undermine the Commonwealth's case by highlighting alleged deficiencies in the Commonwealth's investigation; and

(6) that trial counsel failed to present character evidence favorable to the defense.

To support a claim for ineffective assistance of counsel, a PCRA petitioner must plead and prove three things: first, that the claim has arguable merit; second, that counsel could have had no reasonable basis for the challenged action or omission (subject to the presumption that counsel is acting effectively); and third that the ineffectiveness caused him prejudice.[39] Prejudice occurs where "there is a reasonable probability that, but for

---

[37] Attorney Fioravanti was appointed first to the case, did most of the writing, and was primarily responsible for retaining and supervising court-appointed investigator Sean Hawke. As trial approached, Attorney Penglase assumed the role of lead attorney for the guilt phase, while Attorney Fioravanti primarily handled preparation for, and eventual trial of, the penalty phase.

[38] Johnson's Br. at iii.

[39] *See Commonwealth v. Buehl*, 658 A.2d 771, 777 (Pa. 1995); *Commonwealth v. Pierce*, 527 A.2d 973, 975 (Pa. 1987).

counsel's unprofessional errors, the result of the proceeding would have been different."[40] Failure to prove any one prong of the test will defeat the claim.[41]

The applicable materiality and/or prejudice requirements loom large among these issues. In the absence of the prescribed showing of materiality and/or prejudice, no relief is due under the PCRA. With respect to prison informant Lewis' damning testimony regarding Johnson's alleged confession and the somewhat less damning, but still problematic, testimony of Marquis hinting at Johnson's possible motive for killing Talley, as well as with respect to the way in which counsel met the Commonwealth's DNA evidence, there are two questions bearing upon materiality and prejudice. First, whether a trial conducted wholly without either or both witness' testimony and without the DNA evidence would likely have led to the same result. Second, whether there is a reasonable probability that a trial conducted *including* the testimony of Lewis and Marquis, and including the DNA evidence, but in which counsel engaged in more vigorous and effective impeachment with the advantage of the allegedly withheld and/or wrongfully unfound and/or unused impeachment evidence would likely have led to a different verdict.

## B. The Circumstantial Case Against Johnson

It is axiomatic that guilt may be proved beyond a reasonable doubt by circumstantial evidence alone.[42] And here, there is a circumstantial case to consider that

---

[40] *Commonwealth v. (Raymond) Johnson*, 966 A.2d 523, 533 (Pa. 2009) (quoting *Strickland v. Washington*, 466 U.S. 688, 694 (1984)).

[41] *Commonwealth v. Fears*, 86 A.3d 795, 804 (Pa. 2014).

[42] *Commonwealth v. Kloiber*, 106 A.2d 820, 827 (Pa. 1954) ("[I]t is clearly settled that a man may be convicted on circumstantial evidence alone, provided his guilt is proved beyond a reasonable doubt.").

in no way hinges upon the evidence that Johnson maintains should have been disclosed by the Commonwealth and/or should have been leveraged in impeachment against certain witnesses. Thus, we highlight what in the foregoing account of the circumstantial case against Johnson is unchallenged and points to Johnson's guilt of murdering the victims in this case.

- Johnson was engaged in the drug trade with Talley.

- Johnson had expressed dissatisfaction with his circumstances and sought to improve his fortunes.[43]

- Johnson was alone with Talley about a half-hour or even less before the fire in Talley's apartment was discovered. At that time, Johnson was wearing a dark hoodie, dark pants, and dark shoes.

- Moments before a fire was detected in Talley's apartment, Johnson was seen hastily leaving the apartment complex parking lot in Talley's car, striking another parked car as he went. Attached to the car was a license plate that was not associated with the vehicle registration.

- Shortly after leaving the apartment, Talley's vehicle was observed heading in the direction of the sprawling Levittown Trace Apartments complex. There, Johnson parked the car in a very remote part of the parking lot.

- Johnson then visited the Levittown Trace apartment of an acquaintance, appeared to be worried and nervous, and asked to use her phone. She gave him her phone, and he made calls in the bedroom with the door closed, out of the acquaintance's hearing. Afterward, he spent five to ten minutes in the bathroom. Johnson asked to leave a bag of his belongings with the acquaintance, who refused.

- Johnson made repeated calls to Talley's cousin and sister in the hours after the killings, inquiring as to the situation at Avalon Court. But he refused to return to check on the situation or to turn over Talley's vehicle to police, citing in response to both requests a dubious concern regarding outstanding bench warrants for non-traffic-related summary offenses.

---

[43] As detailed above, his most forceful alleged statement on this point was made to Marquis, which we exclude for present purposes. But he also made similar comments to his girlfriend, who testified that he told her that "he had to do something about making money." N.T.T., 6/1/2015, at 45.

- In the car with Johnson were numerous bags that bore the same stamp as identical bags containing heroin found at Avalon Court around Talley's dead body. Also in the car was a bottle of bleach.

- At the time of Johnson's apprehension he was no longer wearing a dark hoodie. Instead, he was wearing a wrinkled blue sweater and different shoes.

- Johnson was observed by investigators to have two apparently recent lacerations to his hands.

- During Johnson's police interview, he behaved nervously; he was shivering and sweaty.

- Johnson lied repeatedly to investigators, his story shifting in ways material to the investigation. For example, only when confronted with the threat of contradictory video evidence did Johnson withdraw his claim that Talley's car was brought to him by a friend[44] and acknowledge that he had driven it from the Avalon Court lot, striking another car as he did so.

- During his interview, Johnson specifically raised the prospect that the fire was caused by Talley's propensity for leaving a stove burner on in close proximity to pots and pans of cooking grease. At that time, even investigators had yet to learn that cooking oil was present in and around the two fires, neither of which began in the kitchen.

- Johnson's phone was found in Talley's apartment, and his belongings later were found in various locations around the Levittown Trace apartment complex.[45]

Viewed in its entirety and in isolation, this evidence creates a strong circumstantial case for guilt. Johnson's observed behavior not only is compatible with guilt but is incompatible with any other reasonably imaginable sequence of events. Then there is Johnson's general evasiveness with Talley's family members. And, during his interview, Johnson made the improbable allusion to cooking oil as a potential fire hazard, which is almost too on-the-nose to believe.

---

[44] Police efforts to confirm the existence of the friend Johnson named were unsuccessful.

[45] For present purposes, we exclude the items Marquis retrieved from Levittown Trace at Johnson's request. Other bags of belongings were found by investigators.

There is no evidence to support an alternate account, one that explains how someone else committed the crimes in the half-hour or less that separated Johnson's hasty departure from Talley's apartment and the discovery of the fire. The combination of the two—the effort to conceive an alternate explanation for Johnson's behavior and the difficulty conceiving of another perpetrator—make it surpassingly difficult to conclude that a jury would acquit Johnson even without Lewis' testimony regarding Johnson's alleged confession, Marquis' testimony as to motive and certain items retrieved at Johnson's request, and the limited incriminating DNA evidence introduced at trial.

In short, the circumstantial case against Johnson was sufficiently compelling that it is difficult to perceive a reasonable probability that the trial outcome would have differed had the jury simply been denied Lewis' and Marquis' testimony and the relatively modest, equivocal DNA evidence entirely.

## C. The Claims

The above discussion, which presupposes that the jury never heard from Lewis or Marquis, or were given the DNA evidence, does not end our inquiry. Johnson's intertwined arguments about deficient *Brady* disclosures and trial counsel ineffectiveness are based upon the proposition that trial attorneys Penglase and Fioravanti failed to receive from the Commonwealth—and failed to obtain—and/or failed to utilize certain putatively damning impeachment evidence against Lewis, Marquis, and the Commonwealth's DNA expert. Thus, we must consider the likelihood that more effective impeachment of these witnesses at trial—rather than their absence—not only would have discredited their testimony, but would so adversely have affected the prosecution's credibility before the jury that the jury was reasonably likely to have reached a different

verdict. In order to make this assessment, we must review the evidence upon which Johnson's claims are based.

### 1. *Disclosure Violations Under* Brady v. Maryland

> It is well-settled that *Brady* and subsequent precedent flowing therefrom impose[] upon a prosecutor the obligation to disclose all favorable evidence that is material to the guilt or punishment of an accused, even in the absence of a specific request by the accused. *Commonwealth v. Strong*, 761 A.2d 1167, 1171 & n.5 (Pa. 2000). This Court has held that, to establish a *Brady* violation, a defendant has the burden to prove that: (1) the evidence at issue was favorable to the accused, either because it is exculpatory or because it impeaches; (2) the prosecution has suppressed the evidence, either willfully or inadvertently; and (3) the evidence was material, meaning that prejudice must have ensued. *Commonwealth v. Chambers*, 807 A.2d 872, 887 (Pa. 2002); *Commonwealth v. Burke*, 781 A.2d 1136, 1141 (Pa. 2001).[46]

"Under *Brady,* prejudice occurs when a defendant shows a 'reasonable probability that[,] had the evidence been disclosed to the defense, the result of the proceeding would have been different.'"[47] "A reasonable probability does not mean that the defendant would more likely than not have received a different verdict with the evidence; it means only that the likelihood of a different result is great enough to undermine confidence in the outcome of the trial."[48] This Court has held that, "as a matter of law, a court reviewing multiple pieces of exculpatory evidence that the prosecution failed to disclose is required to view the effect of the non-disclosures cumulatively."[49]

---

[46]    *Bagnall*, 235 A.3d at 1086 (citations modified).

[47]    *Commonwealth v. Conforti*, 303 A.3d 715, 730 (Pa. 2023) (quoting *Commonwealth v. Bomar*, 104 A.3d 1179, 1189 (Pa. 2014)).

[48]    *Commonwealth v. (Andre) Johnson*, 174 A.3d 1050, 1056 (Pa. 2017) (cleaned up).

[49]    *Commonwealth v. Natividad*, 200 A.3d 11, 39 (Pa. 2019) (cleaned up).

The *Brady* obligation extends to information that may be used to impeach prosecution witnesses.[50] "Any implication, promise or understanding that the government would extend leniency in exchange for a witness' testimony is relevant to the witness' credibility."[51] However, "*Brady* is not violated when the appellant knew or, with reasonable diligence, could have uncovered the evidence in question, or when the evidence was available to the defense from other sources."[52] "[I]n order to be entitled to a new trial for failure to disclose evidence affecting a witness' credibility, the defendant must demonstrate that the reliability of the witness may well be determinative of his guilt or innocence."[53]

The alleged *Brady* material at issue with respect to Lewis' attempt to serve his own interests by testifying against Johnson broadly involves information and documents, allegedly in the Commonwealth's possession in advance of Johnson's trial, which established that Lewis was a serial informant with a history of providing information, including potentially false information, to law enforcement in order to curry favor. Johnson's own summary of the evidence that he contends was withheld in violation of *Brady* provides a useful structure for discussion:

---

[50]    *(Andre) Johnson*, 174 A.3d at 1056.

[51]    *Bagnall*, 235 A.3d at 1085-86 (cleaned up); *see (Andre) Johnson*, 174 A.3d at 1056-57 (finding impeachment evidence subject to *Brady* where withheld police reports "suggest[ed] that the [the witness] sought to curry favor with the police in the face of ongoing criminal investigations and mounting evidence of his own criminal conduct").

[52]    *Commonwealth v. Roney*, 79 A.3d 595, 608 (Pa. 2013).

[53]    *Commonwealth v. Marinelli*, 810 A.2d 1257, 1273-74 (Pa. 2002) (quoting *Commonwealth v. (Roderick) Johnson*, 727 A.2d 1089, 1094 (Pa. 1999)).

The prosecution had, or could have readily obtained,[54] a plethora of evidence showing that Lewis, a jailhouse informant, had motives to curry favor with the prosecution in order to limit his liability and potential jail time for various charges against him. This evidence included: 1) Lewis's repeated offers to work as an informant for the police and District Attorney Office; 2) a letter Lewis sent to the DAO [*i.e.*, District Attorney's Office] seeking benefits in exchange for his cooperation; 3) efforts made by the prosecutor to advocate on Lewis's behalf with New Jersey authorities who were prosecuting Lewis for criminal offenses; 4) that Lewis would receive consideration on his open cases in exchange for his cooperation; and 5) Lewis lied to prison authorities about the supposed funeral of his granddaughter in an attempt to obtain a furlough.[55]

In sum, Johnson argues, Lewis' offer to provide information about this case to law enforcement was but one among serial "attempts to cooperate with Bucks County law enforcement since arriving" at BCCF in return for favorable treatment in Pennsylvania and relative to certain then-pending charges in New Jersey.[56]

In the leading example cited by Johnson, the Commonwealth allegedly failed to disclose evidence in its possession of ADA Weintraub's email and telephone communications with Attorney Ward, the New Jersey prosecutor overseeing the aforesaid New Jersey charges, which included felony burglary, theft, and domestic violence, which could incur substantial prison terms. Attorney Ward had "agreed to give Mr. Lewis sentencing consideration on his open charges in New Jersey due to his cooperation and

---

54 Johnson cites no case law, and we are not aware of any, to suggest that the Commonwealth is responsible for obtaining *Brady* evidence not already in its possession, except when the source in question obtained the information subject to disclosure as an agent for the Commonwealth. *See Kyles v. Whitley*, 514 U.S. 419, 437-38 (1995); *see infra* n.70 & accompanying text. There is no evidence that BCCF officials were investigating any matters here at issue at the behest of the Commonwealth, as such. Accordingly, we focus only upon what Johnson can establish was in the Commonwealth's possession before and during Johnson's trial.

55 Johnson's Br. at 17-18.

56 *Id*. at 20.

testimony in the Bucks County homicide case."[57]  Attorney Ward attested that he confirmed this by May 27, 2015 email to ADA Weintraub.[58]  Attorney Ward also noted that ADA Weintraub asked him to look into $635 seized from Lewis in connection with his New Jersey arrest.  Ultimately, evidently after Johnson's trial had run its course, Attorney Ward dismissed some of Lewis' open charges and offered time served and a return of the seized money.

To be clear, ADA Weintraub testified that he had no recollection of asking Attorney Ward for any such consideration.[59]  But in Johnson's characterization, ADA Weintraub acknowledged his awareness, in advance of Lewis' testimony, that Attorney Ward intended to grant Lewis favorable consideration in New Jersey for his testimony against Johnson.[60]  ADA Weintraub further admitted discussing the status of Lewis' New Jersey cases with Lewis when he prepared Lewis for trial, and that Lewis asked for assistance.  Again, though, ADA Weintraub indicated that he did not recall whether he told Lewis that he would try to assist him with his New Jersey cases, but he asserted that he would not have promised Lewis any particular benefit.  Rather, it was his custom to promise

---

[57]  *Id*. at 22.

[58]  *See* Email, Attorney Ward to ADA Weintraub, 5/27/2015, Amended Petition for Writ of Habeas Corpus and for Collateral Relief from Criminal Conviction Pursuant to the Post Conviction Relief Act, 42 Pa.C.S. § 9541, *et seq*., Appendix at A-03664 ("Did Mr. Lewis testify as expected?  He is scheduled to be back with us on Monday and I will factor his cooperation level with you into his plea agreement here.") (hereinafter "PCRA Appendix").

[59]  *See*, *e.g.*, N.T.P., 6/28/2023, at 96-98.

[60]  Johnson's Br. at 23 (citing N.T.P., 6/28/2023, at 97).

cooperating witnesses only that he would be "an ally" relative to pending prosecutions.[61] Johnson also claims that Lewis was aware of a potentially favorable plea deal before he testified in Johnson's case, although it is not clear from the averment and citation that Lewis had any reason to understand that prospect as arising from, or contingent upon, his testimony in this case or any effort on his behalf by ADA Weintraub.[62]

ADA Weintraub testified that it was generally his practice to turn information pertaining to such discussions over to the defense.[63] But Attorneys Penglase and Fioravanti both testified that they were unaware of ADA Weintraub's interactions with Attorney Ward regarding the New Jersey cases or of Attorney Ward's pre-trial indication that he would consider Johnson's cooperation in this case.[64]

Johnson separately asserts that Lewis made very similar accusations to BCCF investigators regarding another inmate with whom he served, Shaquel Rock. There, Lewis alleged that Rock had confessed to Lewis that he killed an off-duty corrections officer in Trenton, NJ.[65] This killing and the fact that Rock was a person of interest in the case were reported in mainstream media available to BCCF inmates. New Jersey

---

[61] *See* N.T.P., 6/28/2023, at 91 (indicating that he will generally tell cooperating witnesses "that they will gain an ally in me").

[62] *See* Johnson's Br. at 24-25. The hearing excerpts cited by Johnson subtly differ from his characterization, indicating only that Lewis' attorney believed they were in position to make a deal in New Jersey that would result in a sentence of time-served. Nothing in the excerpts suggests any causative factor without which such a sentence would not be offered.

[63] *See*, *e.g.*, N.T.P., 6/28/2023, at 98.

[64] *See id*. at 173-74 (Attorney Penglase); *See id*., 6/29/2023, at 70-71 (Attorney Fioravanti).

[65] *See* Johnson's Br. at 26-28; PCRA App. at 06358-59 (BCCF Incident Report of Chief Investigator Frank Bochenek, 10/30/2013).

investigators found Lewis' claim incredible, and eventually cleared Rock.[66]  The Commonwealth did not dispute that this report existed or was disclosable *Brady* impeachment evidence, had it been in the Commonwealth's possession.  But the Commonwealth claimed that it was not in its possession at the relevant time.  Rather, it was in BCCF's possession—and, as such, was available to Johnson's trial counsel for the asking in any event.[67]

Nonetheless, asserting that BCCF was acting on behalf of the Commonwealth when it received Lewis' report of Rock's alleged confession, Johnson asserts that the failure to obtain and disclose this information violated the United States Supreme Court's holding in *Kyles* that the prosecution has "a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case[,] including the police."[68]  ADA Weintraub's co-counsel and *de facto* discovery manager, ADA Thomas Gannon, testified that the DAO sometimes directed prison investigators to work on pending cases and those investigators reported to the DAO.[69]  Thus, on Johnson's account, the prosecution had a duty to obtain and disclose this information.[70]  Notably, there is no evidence that

---

[66]     *See* PCRA App. at 06359 (BCCF Incident Report).

[67]     In *Commonwealth v. Hannibal*, 156 A.3d 197, 210-211 (Pa. 2016), this Court found no *Brady* violation where prison record evidence in the Commonwealth's possession was available to the defense by subpoena.

[68]     Johnson's Br. at 27 (quoting *Kyles*, 514 U.S. at 437).

[69]     *See generally* N.T.P., 6/30/2023, at 87-88.  In context, ADA Gannon indicated that in cases where he was cooperating with a prison investigator—*e.g.,* prosecutions associated with crimes committed in prison—he might direct the investigator to follow up on one lead or another.

[70]     Johnson cites as additional support for this obligation the Ninth Circuit decision *Carriger v. Stewart*, 132 F.3d 463 (9th Cir. 1997), in which the court held that the lack of actual possession of prison records establishing witness cooperation was no excuse for (continued…)

BCCF officials were acting at the behest of the DAO in this case. Nor was there any evidence that government control of the records in question was exclusive.

To these detailed allegations of critical omissions relative to Lewis' testimony, Johnson briefly asserts additional omissions. He cites Lewis' alleged lie to the court regarding either the fact or the timing of his granddaughter's funeral in order to gain a furlough.[71] The court granted the furlough, but when authorities "looked into Lewis's request, they discovered that Lewis was lying."[72]

Separately, Johnson asserts that the prosecution violated *Brady* relative to the circumstances of the testimony of Johnson's brother, Marquis Johnson. As set forth above, Marquis testified at trial that, shortly before the killings, Johnson had indicated that he was willing to act precipitously to "make a come up," the salient implication being that Johnson was willing to kill to advance his interests. According to Johnson, in order to extract Marquis' testimony, prosecutors threatened Marquis with prosecution connected to the Talley killing should he refuse to testify.[73] ADA Weintraub was present during that interview, and he acknowledged that Marquis openly worried about his criminal

---

the prosecution's failure to disclose impeachment evidence of a bargain for information, because the prosecution has a duty to learn of exculpatory evidence and "is in a unique position to obtain information known to other agents of the government." *Id*. at 480. Thus, "[t]he state had an obligation, before putting [the informant] on the stand, to obtain and review [his] corrections file, and to treat its contents in accordance with the requirements of *Brady* and *Giglio*." *Id*. Notably, *Giglio* speaks only to the circumstance where one prosecutor falsely represented to a jury that no promise of leniency had been made in exchange for a critical witness' testimony when, in fact, another prosecutor in the same office had made such a promise.

71      *See* Johnson's Br. at 11.

72      *Id*. at 57.

73      *See id*. at 28-29.

exposure.[74] The prosecution also failed to disclose a pending alleged violation of Marquis' probation for domestic violence against his girlfriend that happened shortly before trial.[75]

The PCRA court rejected these claims in turn. With regard to Lewis, the court underscored that ADA Weintraub did not offer to assist him relative to his New Jersey cases. Although ADA Weintraub inquired as to the seized $635, he did not ask for its return and he never followed up on his initial inquiry.[76] With regard to the May 27, 2015 email from Attorney Ward, the court noted the absence of evidence that Lewis was aware of the email or its substance before he testified. Furthermore, the email suggested no agreement between ADA Weintraub and Attorney Ward. The mere hope of leniency is not *Brady* material.[77] The court further noted that the Commonwealth turned New Jersey-related material over to Attorney Penglase in discovery even before the preliminary hearing in this case, and that Attorney Penglase cross-examined Lewis on the information at that hearing. As to additional information, including a letter Lewis sent to prison authorities offering information about other charges, the Commonwealth admitted that it would have been disclosable if it hadn't inadvertently overlooked it, but the court deemed it immaterial because it was cumulative of other evidence, noting, *inter alia*, that the Commonwealth adduced several instances of Lewis' effort to trade information for special consideration at the outset of its direct examination of Lewis.

---

[74] N.T.P., 6/28/2023, at 122-23.

[75] *See* Johnson's Br. at 29.

[76] PCRA Ct. Op., 4/5/2024, at 30-31.

[77] *Id*. at 31 (citing, *inter alia*, *Bomar*, 104 A.3d at 1193-94; *Commonwealth v. Spotz*, 896 A.2d 1191, 1214-16 (Pa. 2006)).

Supporting this claim is the information ADA Weintraub elicited from Lewis on direct testimony regarding Lewis' self-interested basis for testifying:

[ADA WEINTRAUB]. Do you have a—two convictions in 1996 for burglary and theft?

[LEWIS]. Yes.

Q. Is that in New Jersey?

A. Yes.

Q. You have a conviction in 2010 for hindering apprehension?

A. Yes.

Q. Do you have a pending shoplifting case in New Jersey?

A. Yes.

Q. Are you expecting to resolve that case when you get returned from here back to New Jersey?

A. Yes.

Q. You also have a charge over in New Jersey that's pending for burglary?

A. Yes.

Q. In addition, you have some charges that are even older than the ones that we have talked about for crimes of dishonesty in New Jersey?

A. Yes.

Q. Are you currently also facing a parole violation for a fleeing and eluding case here in Bucks County?

A. Yes.

Q. Did you receive an original sentence on this fleeing and eluding from the police case here of 11 and a half to 23 months in [BCCF]?

A. Yes.

Q. At some point, Mr. Lewis, did you receive some additional time on that case the last time you were here because of misconducts?

A. Yes.

Q. And are you currently awaiting to see what will happen for your parole violations?

A. Yes.

Q. When you are done testifying in this case, what is your understanding of what we will do for you?

A. Try and help me out with my parole violation.

* * * *

Q. Have we made any promises to you as to what your sentence is going to be?

A. No.

Q. Will that ultimately be up to a judge?

A. Yes.

Q. Have you testified in a prior proceeding relating to this case?

A. Yes.

Q. And prior to—either before or after that did we give you any assistance?

A. Yes.

Q. What did we do?

A. Helped me out with my—my detainer I had.

Q. Okay. Did you—when you first reported—did you report information that you knew to the jail?

A. Yes.

Q. When you first reported that information that you knew about this case to the jail, did you have those misconducts that we just talked about?

A. Yes.

Q. Was it your hope that you were going to get help with those misconducts?

A. Yes.

Q. Did you, in fact, get any help with those misconducts?

A. No.[78]

As set forth above, there is no question that the prospect of leniency in return for testimony implicates *Brady*. In *Napue,* the United States Supreme Court made comments especially salient to the instant case, because there, as here, *some* information had been given to the jury to indicate that the informant might have been motivated by self-interest to testify against the defendant.

In *Napue*, the state's "principal witness" testified that he had received no promise of consideration for his testimony at the trial in question.[79] In point of fact, the state's attorney *had* promised to recommend a reduction in the witness' sentence for the murder that was the subject of the case at issue. But the prosecutor did not correct the false testimony. The jury was told, however, that an unnamed public defender had promised to "do what he could" for the witness.[80] The question was not specifically a *Brady* question—a decision that was still a few years away when *Napue* was decided—but framed instead as a matter of due process arising from the uncontested failure to flag and/or correct the witness' false testimony. The Illinois court found no basis for relief; in its view the testimony regarding the public defender's intention to seek a benefit for the

---

[78]    N.T.T., 6/1/2015, at 220-23. BCCF investigator Frank Davis also testified that Lewis sought favorable treatment on his pending misconducts in exchange for information. *See id.*, 6/2/2015, at 23-24.

[79]    *Napue*, 360 U.S. at 265-66.

[80]    *Id*. at 268.

witness was sufficient to apprise the jury of the witness' potential motive to falsify testimony.

The Supreme Court found otherwise. The Court noted that the prosecutor's choice to ask the informant at trial whether any official source promised the informant consideration, itself, indicated the prosecution's recognition that the presence or absence of such consideration might sway a jury's credibility determination. "Had the jury been apprised of the true facts," the Court concluded, "it might well have concluded that [the informant] had fabricated testimony in order to curry the favor of the very representative of the State who was prosecuting the case in which [the informant] was testifying, for [the informant] might have believed that such a representative was in a position to implement . . . any promise of consideration."[81] This Court in *(Andre) Johnson* effectively imported this principle into the *Brady* context, when it quoted *Napue* vis-à-vis prejudice: "The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend."[82]

Regarding the materiality component of the *Brady* test, Johnson underscored Lewis' central role in the prosecution, a role that ADA Weintraub characterized as such at the PCRA hearing.[83] Nor is this characterization a *post hoc* assessment. As Johnson highlights, ADA Weintraub in his opening statement referred to Lewis as "one of the most

---

[81]     *Id*. at 270.

[82]     *(Andre) Johnson*, 174 A.3d at 1057 n.6 (quoting *Napue*, 360 U.S. at 269).

[83]     *See*, *e.g.*, N.T.P., 6/28/2023, at 112-13.

important people in this case" due to Johnson's confession.[84]  On ADA Weintraub's own post-trial account, Lewis was an "excellent witness," and the only witness "who gave direct testimony relating to [Johnson's] commission of the murders."[85]

Attorney Penglase admitted that a dominant theme of the defense required discrediting Lewis; "[if] we didn't make him a liar, then Mr. Johnson confessed."[86] Attorney Penglase indicated that he would have used the report regarding Rock had he been aware of it, because the information Lewis was "trying to sell was wrong," and it was "another example of him trying to sell information for benefit."[87]

The Commonwealth does not categorically dispute that disclosable documents regarding Lewis' history of cooperation were not disclosed.  Instead, it argues that the omission was immaterial because it was "cumulative of what trial counsel already knew"[88] and had communicated to the jury.[89]  On the Commonwealth's account, trial counsel was aware of numerous instances of Lewis' cooperation with law enforcement and conveyed that fact to the jury through cross-examination and in its closing argument.

---

[84]    Johnson Br. at 30 (quoting N.T.T., 5/27/2015, at 42-43).

[85]    *Id*.  Tellingly, at the end of ADA Weintraub's concluding narrative, with which he opened his closing argument, ADA Weintraub repeatedly invoked Lewis' putative validation of the ADA's account.  *See generally* N.T.T., 6/2/2015, at 78 ("George Lewis knew that fact."), 79 ("What did George Lewis also tell you?"), 89 ("Another interesting point I'd like to make regarding George Lewis . . ."), 90 ("And that is . . . one of the reasons why [Lewis] is credible and why you should believe him.").

[86]    Johnson's Br. at 30 (quoting N.T.P., 6/28/23, at 247); *see* N.T.P., 6/29/2023, at 5 ("I needed to prove that George Lewis was lying.  If I didn't, Marcel Johnson confessed to him.").

[87]    Johnson's Br. at 31 (quoting N.T.P., 6/28/2023, at 204).

[88]    Cmwlth.'s Br. at 27 (capitalization normalized).

[89]    *Id*. at 28.

It is true that Attorney Penglase spoke only briefly about Lewis' history of cooperation in closing: "The only evidence that we have in this case that directly suggests that Marcel was involved in these murders is George Lewis. George Lewis is a liar. George Lewis has a lifetime of dishonesty. He is a career liar."[90] Thus, while Attorney Penglase argued that Lewis lied in his testimony about aspects of his interactions with Johnson, the above quotation is all Attorney Penglase had to say about Lewis' lengthy, now-undisputed history of informing on fellow inmates and others for personal advantage—evidence that ADA Weintraub admitted he would consider disclosable, and that Attorney Penglase indicated he would have liked to have had in his possession and might have used in impeachment, given the opportunity.

The PCRA court was unconvinced. First, it underscored a categorical lack of evidence that the Commonwealth *offered* Lewis assistance with his then-pending New Jersey charges. While ADA Weintraub passed on Lewis' inquiry regarding his seized cash, in no way did he seek its return. And he never followed up on his request. Similarly, while Attorney Ward in an email to ADA Weintraub indicated that he would grant consideration of Johnson's testimony in connection with those outstanding New Jersey charges, there was no evidence that Lewis was aware of this email or the sentiment Attorney Ward conveyed in it. ADA Weintraub acknowledged uncertainty in the details but was confident that he promised nothing as to the charges pending in New Jersey or

---

[90]     N.T.T., 6/2/2015, at 71.

otherwise.[91]  The PCRA court emphasized that an informant's "hope is certainly not *Brady* material."[92]

Among things that were admittedly not disclosed, the court acknowledged the Commonwealth's admission that it inadvertently withheld a letter that Lewis sent to Bucks County authorities offering to cooperate in a prior case in that county in exchange for leniency in a then-pending case against him.  The ADAs in this case testified that they were not aware of the letter in question.  Noting that ignorance is not a defense against a *Brady* violation, the court then turned to materiality.  The court found that the letter would have been no more than cumulative, because the jury was conscious of numerous attempts Lewis had made to cooperate in exchange for personal advantage.  To impeach using the letter merely would have contributed to the sense that Lewis had an incentive to lie, but the jury was made well aware of this prospect in any event by the prosecution at trial.  As well, trial counsel testified that Lewis was effective on the stand, and counsel

---

[91]    In a candid moment, ADA Gannon indicated that the DAO's "practice was not to make promises to anyone, because if you make a promise, obviously, you have to disclose that.  And I believe there was no specific promise made to Mr. Lewis . . . ." N.T.P., 6/30/2023, at 51.

[92]    PCRA Ct. Op. at 31 (citing to similar effect *Bomar*, 104 A.3d at 1193; *Commonwealth v. Santiago*, 654 A.2d 1062, 1081-82 (Pa. Super. 1994)).  The court was similarly dismissive of Johnson's claim that the prosecution knew but did not disclose a prior connection between Lewis and Talley.  But the evidence of this was found in prison phone calls the records of which (a) were not in the Commonwealth's possession but (b) *were* in the defense's possession.  *Id*. at 32.  The court further added that Attorney Penglase had a reasonable basis for not cross-examining Lewis on the possible connection.  In this regard, the court indicated that "[e]vidence at trial established that George Lewis did not know of Ms. Talley or her family prior to meeting [Johnson] in [BCCF].  Therefore, George Lewis' lack of connection to Ms. Talley was already known to the jury and any additional questioning would have been futile."  *Id*.  On this basis as well, the court found, Johnson was not prejudiced.

had no interest in extending his testimony, lest counsel's own credibility be undermined.[93] Instead, counsel relied upon the testimony of a prison investigator to confirm that Lewis offered to come forward in tandem with a request for assistance with his prison misconducts.[94]

Finally and generally, the court found that, to the extent that Johnson's claims involved information contained in prison records, including the aforesaid letter regarding Shaquel Rock, the Commonwealth neither had possession of those records nor had any obligation to obtain them and turn them over. Rather, those records were equally available to the defense, and when that is the case, no *Brady* violation occurs.[95]

Next, the PCRA court considered Johnson's claims regarding impeachment evidence as to Marquis, evidence which suggested that the police had threatened Marquis, explicitly or implicitly, with the specter of prosecution in association with his role in events underlying this case. Johnson's allegation in the PCRA court was that a promise of leniency on various pending charges to extract from Marquis testimony about Johnson wanting "to make a come up" contributed to a jury finding that Johnson had a motive for the crimes. The most compelling support for this claim was ADA Weintraub's own testimony regarding an interrogation at which he was present. There, he agreed with PCRA counsel that information was communicated to Marquis that he "could be potentially charged or criminally responsible for destroying evidence or lying to or

---

[93]    *Id*. at 34.

[94]    *Id*.

[95]    *See Roney*, 79 A.3d at 608 ("*Brady* is not violated when the appellant knew or, with reasonable diligence, could have uncovered the evidence in question, or when the evidence was available to the defense from other sources.").

obstructing justice."[96]   On Johnson's account, evidence that the prosecution had threatened Marquis shortly before he offered his account of Johnson's alleged statement about making "a come up" might have been worthy impeachment evidence that trial counsel could have used had it been in his possession.[97]

The PCRA court found that Johnson had waived this claim by failing to call Marquis Johnson to testify at the PCRA hearing.   On the PCRA court's account, rendered problematic by the record, the only outstanding issues for Marquis were pending probation and parole violations, as to which he was not contacted until after trial.   Because leniency could only have been promised with the cooperation of the probation and parole officials, and they had yet to contact Marquis, no such offer could have been extended. Accordingly, no relief was due.[98]

We find no error in the result reached by the PCRA court.

> [W]e have observed that "due process requires the jury to be informed of any promise or understanding that the government would extend leniency in exchange for a witness's testimony." *Commonwealth v. Chmiel,* 30 A.3d 1111, 1131 (Pa. 2011).   Indeed, "[a]ny implication, promise or understanding that the government would extend leniency in exchange for a witness' testimony is relevant to the witness' credibility." *Strong,* 761 A.2d at 1171.   Notably, we have further explained that the promise or "understanding between the prosecution and its testifying witness need not be in the form of a signed contract or a completed, ironclad agreement in order to qualify as *Brady* material," *Chmiel,* 30 A.3d at 1131, as

---

[96]   N.T.P., 6/28/2023, at 122-23.

[97]   Johnson's Br. at 31.

[98]   As noted above, the fact that the specter of criminal liability was dangled before Marquis during police question is established in the PCRA record by the testimony of ADA Weintraub, who was present at the interview in question.   As well, the record contains a 2019 declaration by Marquis, which largely concerns what Marquis could have testified to relative to mitigation, but also contains an allegation that police threatened to implicate him in the murders of Talley and R.R. if he did not cooperate.   *See* PCRA App. at A-00421-22.

impeachment evidence relating to "the credibility of a primary witness against the accused is critical evidence and it is material to the case whether that evidence is merely a promise or an understanding between the prosecution and the witness." *Strong*, 761 A.2d at 117.[99]

Here, the testimony does not establish that any promise of leniency, express or implied, was made in this case, at least not to Lewis.[100] Furthermore, we agree with the PCRA court that the evidence in question by and large would have been cumulative of evidence admitted at trial—or possessed by the defense, which elected not to introduce it—that made clear that Lewis had a history of seeking assistance in exchange for information concerning other criminality.

In seeking to establish materiality, Johnson underscores Lewis' apparently false claim to prison officials that Shaquel Rock confessed to a nightclub shooting in New Jersey, highlighting Attorney Penglase's PCRA testimony that it would have served as useful impeachment evidence because "it appears that the information that Lewis was trying to sell was wrong. And, two, it's another example of him trying to sell information for benefit."[101] And regarding Marquis, Johnson argues that "[e]vidence that Marquis Johnson was threatened with being charged in the murder of Ebony Talley immediately before he provided an incriminating statement against Mr. Johnson could have been used by competent counsel to show that Marquis had fabricated this story about the 'come up' to . . . avoid being charged in the homicide."[102]

---

[99]     *Bagnall*, 235 A.3d at 1086 (citations modified).

[100]    Marquis presents a more complicated case, in this regard.

[101]    Johnson's Br. at 31 (quoting N.T.P., 6/28/2023, at 204).

[102]    *Id*.

Undoubtedly, the evidence Johnson highlights would have been of at least some superficial benefit to Attorney Penglase in fortifying Johnson's defense, inasmuch as it would have reflected poorly on both Lewis and Marquis. This, in turn, might have dented the principal evidence of motive (Marquis) and the only direct evidence of guilt (Lewis).

But we must conclude that Johnson has failed to establish materiality. We already established that a trial totally devoid of this challenged evidence would have led to the same result on the strength of the circumstantial case for guilt. Assessing the probable outcome of a trial at which Attorney Penglase's cross-examinations of Lewis and Marquis proceeded with the benefit of potentially omitted *Brady* information, we arrive at the same conclusion. As to Lewis, in general terms, his effort to cooperate with law enforcement in service of his own self-interest was established by the Commonwealth on direct examination. Marquis' testimony in a sense was cumulative of Martinez's testimony to similar effect, albeit lacking the evocative "make a come up" language. As well, informing Marquis of the mere prospect of criminal exposure neither is a promise of leniency nor can it be assumed to have extracted his materially corroborated testimony. And even if Marquis had been discredited in the eyes of the jury, Martinez's unchallenged testimony was to similar effect. Finally, evidence of motive is not necessary to a homicide prosecution.[103]

Here as well, the strength of the circumstantial case and the other evidence (assuming for this analysis that ineffectiveness claims against that evidence are unsuccessful) overwhelms the prospect of prejudice. And in this regard, we merely advert

---

[103]    *Cf. Commonwealth v. De Petro*, 39 A.2d 838, 840 (Pa. 1944) ("Proof of motive is never necessary . . .[,] but it is always relevant.").

to the trial court's original account of the voluminous circumstantial case against Johnson as supplemented and distilled above. Regardless of the vigor and rigor of the cross-examinations of Lewis and Marquis with the benefit of the allegedly undisclosed *Brady* evidence, our confidence in the jury verdict is not sufficiently undermined. Consequently, even assuming Johnson's account of the *Brady* violations bears out, he cannot obtain relief on that claim for want of a showing of materiality and of prejudice.[104]

### 2. Failure to Correct False Testimony

In a closely related, narrower issue, Johnson argues that the Commonwealth violated his due process rights when it knowingly failed to correct false testimony—specifically Lewis' allegedly too-narrow account of what he hoped to gain from testifying against Johnson in this case.

Recently, the Supreme Court addressed the subject of uncorrected false testimony in *Glossip v. Oklahoma*.[105] There, the Court explained the governing standard as follows:

> In *Napue*, this Court held that a conviction knowingly "obtained through use of false evidence" violates the Fourteenth Amendment's Due Process Clause. 360 U.S. at 269. To establish a *Napue* violation, a defendant must show that the prosecution knowingly solicited false testimony or knowingly allowed it "to go uncorrected when it appear[ed]." *Ibid.* If the defendant makes that showing, a new trial is warranted so long as the false testimony "may have had an effect on the outcome of the trial," *id*. at 272—that is, if it "'in any reasonable likelihood [could] have affected the judgment of the jury,'" *Giglio*, 405 U.S. at 154 (quoting *Napue*, 360 U.S. at 271). In effect,

---

[104] *See Commonwealth v. Abdul-Salaam*, 42 A.3d 983, 987 (Pa. 2012) (even assuming a cumulative analysis of multiple items of *Brady* non-disclosure, concluding that materiality was not established due to a failure to show a reasonable probability of a different outcome with the benefit of the *Brady* evidence in question).

[105] 145 S. Ct. 612 (U.S. 2025). This decision is the subject of a Motion to Allow Post-Submission Communication that Johnson filed pursuant to Pa.R.A.P. 2501. The Commonwealth does not oppose this Motion, though it contests the utility of *Glossip* to Johnson's appeal. We hereby grant Johnson's Motion to Allow Post-Submission Communication.

this materiality standard requires """the beneficiary of [the] constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.""" *United States v. Bagley*, 473 U.S. 667, 680, n. 9 (1985) (quoting *Chapman v. California*, 386 U.S. 18, 24 (1967)).[106]

In so many words, if the defendant establishes that the prosecutor knowingly allowed false testimony to stand uncorrected, the burden rests with the Commonwealth to establish lack of prejudice.

We have addressed the evidence Johnson relies upon for this issue previously. It includes evidence that he maintains was discoverable under *Brady* (as discussed above) and information that Attorney Penglase might have discovered given due investigation (as discussed below). In short, Johnson contends that Lewis testified falsely about "the benefits he expected to receive for his cooperation."[107] When asked whether he hoped to gain anything by his testimony, Lewis specifically alluded to help with his parole violation, an associated detainer, and institutional misconducts he had had at BCCF—all as related in the lengthy excerpt of his testimony set forth above in connection with his *Brady* argument.

This testimony about what Lewis hoped to gain, on Johnson's account, was not false in itself. But Johnson maintains that it was effectively false inasmuch as it omitted aspirations to leniency of which the prosecutor was aware. In particular, Johnson alleges, ADA Weintraub knew that Lewis stood to gain favorable consideration for his cooperation in connection with open charges pending in New Jersey. At the PCRA hearing, ADA Weintraub acknowledged that he knew, before Lewis testified at Johnson's trial, that

---

[106]     *Glossip*, 145 S.Ct. at 626-27 (citations modified).

[107]     Johnson's Br. at 38.

Attorney Ward intended to consider Lewis's Pennsylvania cooperation in fashioning a plea agreement disposing of Johnson's New Jersey charges. Nor was ADA Weintraub's willingness to raise his cooperation with New Jersey prosecutors unknown to Lewis: to the contrary, Lewis asked ADA Weintraub to inquire of New Jersey prosecutors regarding $635 seized from him at the time of his New Jersey arrest, and ADA Weintraub undisputedly did so.

The PCRA court, relegating its discussion of this claim to a footnote, adverted directly to its review of the *Brady* allegations. "In short," it explained, "while [Johnson] believes Mr. Lewis did not accurately mention the assistance with his pending New Jersey matter he expected to receive in return for his testimony, this Court finds that no such promise by the Commonwealth was made to Mr. Lewis."[108] With no such promise comes no false testimony.

Having set forth in full ADA Weintraub's direct examination with regard to Lewis' outstanding charges at the time of his testimony and what he hoped to gain by his cooperation, we reiterate only the general points. First, ADA Weintraub adduced testimony regarding the charges against Lewis outstanding in New Jersey. Then ADA Weintraub inquired regarding an outstanding parole violation in Bucks County awaiting disposition as well as prison misconducts. "When you are done testifying in this case," ADA Weintraub then asked, "what is your understanding of what we will do for you?" Lewis replied, "Try and help me out with my parole violation."[109] Lewis further indicated that he had not been promised any particular sentence. Lewis also acknowledged prior

---

[108]    PCRA Ct. Op. at 29 n.7.

[109]    N.T.T., 6/1/2015, at 222.

prosecutorial assistance with an outstanding detainer. Finally, Lewis admitted that, in bringing information to prison authorities, he hoped to gain assistance with outstanding prison misconducts, but indicated that he received no such help.[110]

What we take from this testimony is that the jury was adequately informed that Lewis had offered information and testimony for personal benefits in this case. The jury also knew that Lewis could anticipate that cooperation sometimes invites prosecutorial assistance in pending matters. The jury was aware that Lewis had serious criminal charges outstanding in New Jersey. What we do not perceive in Lewis' testimony is any lie of commission or omission. ADA Weintraub asked specific questions to which he received focused, evidently true answers. As to the open-ended question concerning Lewis' expectation of any further assistance after his testimony, the only arguable omission raised by Johnson pertains to the New Jersey prosecution. Setting aside that the jury had been informed generally about Lewis' outstanding New Jersey charges, the PCRA court found that no promise of assistance, express or implied, had been extended with respect to these charges. This finding of fact is supported by the record; we may not disturb it.

We note as well that a due process violation for failure to correct false testimony is subject to the materiality analysis that applies to other *Brady* violations.[111] And here, given the overlap—the harm asserted ultimately being the want of more vigorous direct and/or cross-examination regarding the prospect of assistance with the New Jersey

---

[110] *Id*. at 223.

[111] *See Commonwealth v. Wallace*, 455 A.2d 1187, 1190-91 (Pa. 1983). It bears mention that, as in *Wallace*, this Court has treated a failure to correct false testimony as one among several categories of *Brady* violation.

charges—our materiality analysis is the same. There is no reason to question the jury's verdict due to the strength of the circumstantial case against Johnson.

### 3. Ineffective Assistance of Counsel, General Failure to Investigate and Impeach

As set forth above, to support a claim for ineffective assistance of counsel, a PCRA petitioner must plead and prove three things: first, that the claim has arguable merit; second, that counsel could have had no reasonable basis for the challenged action or omission (subject to the presumption that counsel is acting effectively); and third that the ineffectiveness caused him prejudice.[112] Prejudice occurs where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."[113] Failure to prove any one prong of the test will defeat the claim.[114]

Principally at issue are deficiencies in trial counsel's investigation and impeachment of Lewis, Johnson, and the DNA evidence. This Court has explained:

> Counsel has a general duty to undertake reasonable investigations or make reasonable decisions that render particular investigations unnecessary. *Commonwealth v. Basemore,* 744 A.2d 717, 735 (Pa. 2000) (citing *Strickland,* 466 U.S. at 691). Counsel's unreasonable failure to prepare for trial is "an abdication of the minimum performance required of defense counsel." *Commonwealth v. Brooks,* 839 A.2d 245, 248 (Pa. 2003) (quoting *Perry,* 644 A.2d at 709). The duty to investigate, of course, may include a duty to interview certain potential witnesses; and a prejudicial failure to fulfill this duty, unless pursuant to a reasonable strategic decision, may lead to a finding of ineffective assistance. Recently summarizing cases in *Commonwealth v. Dennis,* 950 A.2d 945 (Pa. 2008), this Court stated that:
>
> > These cases . . . arguably stand for the proposition that, at least where there is a limited amount of evidence of guilt, it is *per se* unreasonable not to attempt to investigate and interview known eyewitnesses in connection with defenses that hinge on the

---

[112]  *See Buehl*, 658 A.2d at 777; *Pierce*, 527 A.2d at 975.

[113]  *(Raymond) Johnson*, 966 A.2d at 533 (quoting *Strickland*, 466 U.S. at 694).

[114]  *Fears*, 86 A.3d at 804.

credibility of other witnesses. They do not stand, however, for the proposition that such an omission is *per se* prejudicial.

> *Id.* at 960 (citing *Perry, supra; Commonwealth v. Weiss,* 606 A.2d 439, 442-43 (Pa. 1992); *Commonwealth v. (Harold) Jones,* 437 A.2d 958 (Pa. 1981); *Commonwealth v. Mabie,* 359 A.2d 369 (Pa. 1976)) (emphasis omitted).[115]

In short, as Johnson frames it, "counsel's strategy at trial is only as reasonable as his investigation that supported such strategy."[116] Nonetheless, we must grant a "heavy measure of deference to counsel's judgments."[117]

We address the alleged deficiencies in Attorney Penglase's investigation and impeachment in turn, concluding by considering the cumulative prejudicial effect of what we find to be several troubling deficiencies in Attorney Penglase's approach to preparing Johnson's defense.

Although Johnson leads with a discussion of Attorney Penglase's alleged prejudicial failure to investigate Lewis specifically, we first take up Johnson's contention that Attorney Penglase's pre-trial investigation was *categorically* deficient. This issue focuses upon alleged deficiencies in the police investigation that counsel failed to exploit in service of his "empty chair" defense, by which Attorney Penglase indicated that he sought to create an open question as to who killed the victims by suggesting or implying an unspecified cohort of shadowy, deliberately unnamed potential killers.

Johnson underscores Talley's drug dealing business and the risks to which that exposed her. According to Johnson, she was known to sell fake drugs and had a reputation as a snitch, both perilous behaviors in the drug business. Police did not

---

[115]    *(Raymond) Johnson*, 966 A.2d at 535-36 (citations modified).

[116]    Johnson's Reply Br. at 19-20 (citing *Wiggins v. Smith*, 539 U.S. 510, 528 (2003)).

[117]    *Wiggins*, 539 U.S. at 521-22.

investigate those aspects of her life or fully explore the people she interacted with the day she was killed. For one thing, police did not timely request Talley's phone records, despite the facts that the killer took her phone and that she was known to have used it frequently up to very shortly before her death. Because police waited six months to request the phone records, they could not obtain the substance of her text messages immediately before her death, which might have been available had they acted more promptly. What they did obtain was a general log of the calls and texts to and from her phone in the days before and the day of her murder. But they never sought to identify or interview the individuals to whom the numbers corresponded—*i.e.*, the people with whom she communicated, especially on the day of her killing.

Johnson had told investigators that, when he left the apartment before the killings, Talley had a drug customer on the way. Johnson offered the same information to Attorney Penglase and allegedly asked him to review Talley's phone traffic from the day of the killing, but Attorney Penglase failed to do so. At first, he did not even request the records from the Commonwealth, but when eventually he obtained them, he did nothing more. Neither he nor Attorney Fioravanti directed investigator Sean Hawke to follow up on the numbers.

Police also had information regarding several people who frequented Talley's apartment and allegedly were involved in Talley's drug business. They were associated with a white Crown Victoria like one the police seized outside the apartment, which was registered to Kevin Kerkula, with whom police had reason to believe Talley was romantically involved. No one ever claimed the car, but police made no effort to perform a forensic analysis of the car or to interview Kerkula.

Evidence suggested Talley had several recurring sexual partners, and she was found dead in the apartment with her pants down and her underwear ripped. But counsel made no effort to investigate these relationships.

When asked to explain why he did not follow up on—or at least highlight at trial—these deficiencies in the police investigators' efforts, Attorney Penglase expressed that, in pursuing an "empty chair" defense, he did not want to identify specific candidates for fear that the prosecution could obtain rebuttal evidence that effectively proved that each specific alternative killer could not be guilty.[118] Johnson disagrees; in his view this is incoherent, because counsel did not need to identify any one suspect to highlight the investigative deficiencies. It would have sufficed simply to elicit at trial all the leads police investigators did *not* pursue. The prosecution would have been more or less incapable of rebutting that evidence.

As critically, counsel effectively confessed to conducting *no* material investigation in this case. He "didn't interview any witnesses."[119] He did not tell his investigator to interview a single witness.[120] He declined to follow up on any of the leads Johnson provided him because much of Johnson's voluminous narrative "wasn't even internally consistent."[121]

---

[118]    N.T.P., 6/28/2023, at 159.

[119]    *Id.* at 158.

[120]    *Id.* To be clear, investigator Hawke did canvass Avalon Court, speak with various residents, and report back to Attorney Fioravanti. *See id.*, 6/29/2023, at 9-10, 16. So it cannot fairly be said that he did nothing.

[121]    *Id.*, 6/28/2023, at 161.

The only reason Attorney Penglase offered for his failure to investigate was his claim that doing so would have disserved his empty chair defense, though it is not entirely clear how. It seems he was concerned about reciprocal discovery obligations[122]—ostensibly that he would have to disclose any leads he pursued that turned out to be dead ends or to be compatible with Johnson's guilt—but it is not clear what authority would require disclosure of defense counsel's investigative dead ends.[123] This misunderstanding of the law and the failure to disabuse himself of it, Johnson argues, "is a quintessential example of unreasonable performance under *Strickland*."[124]

---

[122] *See id*. at 153 (explaining failure to request prison files that he did not receive in discovery because he "did not want to obtain a document that [he] would have to turn over in reciprocal discovery").

[123] In criminal cases, the defendant's discovery obligations are limited to what the prosecution shows to be "material[] to the preparation of the Commonwealth's case . . ., subject to the defendant's rights against compulsory self-incrimination," among the following items: (1) "results or reports of physical or mental examinations, and of scientific tests or experiments made in connection with the particular case, . . . that the defendant intends to introduce as evidence in chief, or were prepared by a witness whom the defendant intends to call at the trial"; and (2) "the names and addresses of eyewitnesses whom the defendant intends to call in its case-in-chief." Pa.R.Crim.P. 573(C)(1). Notably, there is no rule-based discovery obligation to produce the results of investigations that the defense does not intend to introduce in its case-in-chief. And this Court, at least, has never suggested otherwise. *See generally Commonwealth v. Kennedy*, 876 A.2d 939, 946-49 (Pa. 2005) (reviewing generally the requirements and limitations of Pa.R.Crim.P. 573(C) and its interaction with the work-product doctrine). Which is to say that Attorney Penglase was free to investigate any leads he chose without fear that the mere fact or results of his investigations would be discoverable to the prosecution if he chose not to present them at trial. Thus, at least arguably, no harm could have come from more rigorous investigation.

[124] Johnson's Br. at 88 (quoting *Hinton v. Alabama*, 571 U.S. 263, 274 (2014) ("An attorney's ignorance of a point of law that is fundamental to his case combined with his failure to perform basic research on that point is a quintessential example of unreasonable performance under *Strickland*.")).

Johnson correctly asserts that counsel "has a general duty to undertake reasonable investigations or make reasonable decision[s] that render particular investigations unnecessary."[125] Here, he maintains, Attorney Penglase had no reasonable basis to forego an entire array of available investigative leads that might have led to at least hints of other parties with motive and opportunity to have killed the victims.

Among people the police failed to identify from phone records and that both counsel and police failed to investigate were John Clinton, who stipulated for purposes of the PCRA hearing that Johnson was not in competition with Talley for drug business and that both obtained drugs from the same supplier. Clinton also would have testified that Kerkula contacted him the day of the murder; Kerkula was the next to last person Talley communicated with that day. At a minimum, counsel could have challenged investigators' failure to investigate Kerkula. Another person who appeared on Talley's phone log from the day of the killing was Mark Wilson. Wilson had a criminal record for setting fire to his parent's house while his mother was home—and taking her cell phone. This information is suggestive, at the very least.

In sum, cell phone records at least implied that a drug customer may have been on the way to visit Talley at the same time that Johnson allegedly killed her, that Talley had informed numerous people the morning of her killing that she had a large volume of heroin to sell, and that Johnson had no apparent motive to kill a business associate.

The PCRA court accepted Attorney Penglase's explanation that his strategy actually comported with Johnson's desired defense—that he highlighted Talley's "dangerous lifestyle" and that Johnson's own litany to counsel of potential leads was

---

[125] *Id*. (citing *Commonwealth v. Cox*, 983 A.2d 666, 692 (Pa. 2009)).

internally inconsistent and therefore was insufficient to warrant further exploration. The court also rejected suggestions that the defense investigator's efforts were wanting: on the PCRA court's account, "Hawke interviewed key witnesses uncovered by police, canvassed the Avalon Court apartment complex in search of additional witnesses, and effectively neutralized Commonwealth witnesses. . . . [He] was not required to investigate every drug dealer, every drug user, or every criminal with whom Ms. Talley associated. . . ."[126] The court further indicated that Johnson's "own, new investigation has not produced anything of value other than inadmissible conjecture, rumor, and speculation."[127]

The PCRA court also rejected the claim that counsel should have done more to reveal the alleged deficiencies in the police investigation. "[I]f he would have done so," the court concluded, "he would have opened the door to the testimony regarding the number of witnesses interviewed and the number of other individuals investigated and eliminated as suspects by the Commonwealth," undermining the empty chair strategy.[128] Thus, trial counsel's strategy was reasonable.

We find the PCRA court's dismissive response to these issues nearly as unsatisfying as counsel's minimal investigation and effort to call into question what may have been an insufficient police investigation. As noted, counsel's avowed failure to

---

[126] PCRA Ct. Op. at 14.

[127] *Id*. at 15.

[128] *Id*. (echoing, *inter alia*, Attorney Penglase's testimony that he "was much happier to present the jury with an empty chair of potential killers rather than present them with the name of someone the Commonwealth could contradict," N.T.P., 6/28/2023, at 159).

investigate must have been informed by a reasonable strategy,[129] and it is not at all clear that such a strategy is present here.

Having said that, we cannot reject out of hand the PCRA court's suggestion that the putative evidence counsel could have uncovered—even assuming the individuals in question were available to testify—would not have been useful to the defense. Similarly, while it may be the case that the police investigation was thin enough that the prosecution would have had no way of rebutting criticism of its investigative efforts, the question whether counsel had a reasonable basis for fearing this to be the case does not depend on what hindsight suggests could have happened had counsel pursued this line of inquiry. We cannot allow 20/20 hindsight to cloud our consideration of the context in which counsel made tactical and strategic decisions.[130]

Finally, there is the question of prejudice. The unpursued prospect of obtaining the evidence identified above—at least as characterized by Johnson—which might call into question the identity of the killer to some degree undermines confidence in the verdict. Detective Jack Slattery testified at the PCRA hearing that there was no reason not to have obtained the phone records sooner, because the absence of Talley's phone from the scene suggested that it had been taken by the killer to hide incriminating evidence

---

[129]  *See (Raymond) Johnson*, 966 A.2d at 535-36.

[130]  *See Commonwealth v. Williams*, 141 A.3d 440, 463 (Pa. 2016) (determining "whether counsel's decision had any basis reasonably designed to effectuate his client's interest" "cannot be a hindsight evaluation of counsel's performance, but requires an examination of whether counsel made an informed choice, which[,] at the time the decision was made[,] reasonably could have been considered to advance and protect the defendant's interests" (cleaned up)).

that might be found on it.[131]  Had the records been sought sooner after the murder, there was some chance that they would have contained the content of text messages sent the day of the murder.[132]  This was especially problematic inasmuch as Talley had used her phone the day of her murder as late as 2:49 p.m., minutes before her death.[133]

Having said as much, we must also acknowledge that a handful of drug-dealing or drug-consuming witnesses who might muddy the waters of the case for Johnson's guilt by hinting at alternative killers does not affect, in our view, the strength of the circumstantial case for Johnson's guilt.  Even if someone else might have had opportunity, that does not explain Johnson's frantic behavior at the relevant time, his persistent inquiries regarding the fire, his serial refusals to cooperate with family and police who enlisted his assistance, his shifting stories under police questioning, Talley's DNA under Johnson's fingernails,[134] and so on.

On balance we cannot find sufficient prejudice arising from these allegations to sustain an ineffective assistance claim arising from the facially deficient quality of counsel's investigation.  The law counsels against applying a *per se* rule finding prejudice any time counsel's investigation is wanting,[135] and here it would take such a rule to overcome the circumstantial case against Johnson.

---

[131]     N.T.P., 8/9/2023, at 12-14, 23.

[132]     *Id*. at 12.

[133]     Johnson's Br. at 90.

[134]     As set forth below, this evidence may have been subject to more effective impeachment than Attorney Penglase managed.  But it still had an evidentiary foundation, and the jury may well have found the Commonwealth's expert convincing even in the face of a more effective attack.

[135]     *See Dennis*, 950 A.2d at 960.

*4. Ineffective Assistance, Failure to Impeach George Lewis*

With respect to Lewis, counsel's alleged omissions largely pertain to obtaining and/or utilizing prison records—those obtained, those overlooked, the distinction between which is blurry at times—and potentially available records concerning the New Jersey prosecutions. We have already reviewed the direct and cross-examinations at trial of Lewis regarding the pending New Jersey matters; ADA Weintraub's PCRA testimony regarding the limited extent to which he offered assistance with those charges; the PCRA court's sustainable finding of fact that ADA Weintraub never promised anything relative to New Jersey in return for Lewis' testimony; and the allegations regarding prejudice arising from any failure to disclose records in the Commonwealth's possession that pertained to the outstanding New Jersey matter. We found no prejudice, and the same applies here, even to the extent that counsel could have conducted a more rigorous examination and could have utilized the records thus obtained to enhance his efforts to impeach Lewis.

There also appears to be some confusion in the PCRA record concerning what prison records Attorney Penglase had in his possession, though there is little dispute that he neglected to use the New Jersey-related material they contain at trial. These records could not be the subject of the above *Brady* analysis, because we find that ADA Weintraub had no obligation to produce them.

This does not change the analysis. Inasmuch as all of the evidence in question would have gone to Lewis' veracity, the frequency of his efforts to curry favor, and the degree to which he sought or expected consideration for his testimony in this case, we cannot conclude that under such impeachment it is reasonably probable not only that the

jury would have rejected the substance of Lewis' testimony but that, in so doing, it would have found the prosecution in its entirety so flawed as to reach a different verdict.

For want of prejudice, this claim fails.

### 5. Ineffective Assistance, Failure to Impeach Marquis Johnson

Here, too, our analysis is materially the same as it was in connection with Johnson's parallel *Brady* claim. Even if we assume that Attorney Penglase was aware of—and had vigorously cross-examined Marquis concerning—the alleged threats of prosecution that investigators leveled in an effort to extract testimony against Johnson, Marquis' evidence was substantially similar to Martinez's and was less than essential to the circumstantial case, as fortified by other evidence, including DNA, Johnson's jailhouse confession, and so on.

In short, on our reading, Marquis' testimony was of only secondary benefit to the prosecution, adding cumulative evidence of Johnson's effectively undisputed involvement with Talley in the drug trade. His lone distinctive contribution was relative to asserting a putative motive, which is neither necessary nor, in this case, terribly beneficial, given the strength of the circumstantial case. Here as well, the ineffectiveness claim fails due to Johnson's failure to establish the reasonable probability of a different outcome had trial counsel impeached Marquis relative to his own criminal exposure.

### 6. Ineffective Assistance, Failure to Challenge DNA Evidence

At issue here is Johnson's contention that trial counsel failed "to investigate, consult with an expert, or otherwise properly prepare to confront the Commonwealth's DNA testimony."[136] At the outset, it is important to note that the only substantial DNA

---

[136] Johnson's Br. at 65.

evidence linking Johnson to Talley was the presence of Talley's DNA under Johnson's fingernails, which allegedly signaled "intimate contact." No serology analysis had been performed to determine the source of that DNA, *i.e.*, skin, blood, etc. Arthur Young, an expert whom both defense attorneys consulted, indicated in his declaration that "it was likely that the victim's DNA was due to transfer, as [Johnson] was an occupant in [Talley's] residence and only needed to come in contact with objects in that residence to pick up detectable levels of her DNA on or under his fingernails."[137] In the same declaration he highlighted other potential weaknesses in the Commonwealth's DNA expert's analysis and indicated that he was, at the time of trial, available and willing to prepare a report and testify as to these flaws.[138]

Attorney Penglase undisputedly had maintained some contact with Young. And he undisputedly sought and was granted permission to have Young in the courtroom during the Commonwealth's expert's testimony, ostensibly to ensure adequate preparation for cross-examining that witness.[139] However, very shortly before trial, Attorney Penglase cut off contact with Young, evidently because he learned that Young had been discredited in New York for lying under oath.[140]

Regarding his decision to proceed to trial without a DNA expert in the courtroom, Attorney Penglase testified as follows:

> Q. Well, without an expert in the room, what was your plan to attack the DNA information that was testified to.

---

[137]  Decl. of Arthur Young, 7/11/2019, at 4 ¶16, PCRA Appendix at A-05988.

[138]  *Id*. at 7-8 ¶26, PCRA Appendix at A-05991-92.

[139]  *See* Johnson's Br. at 66-67.

[140]  N.T.P., 6/29/2023, at 79-80.

A. My plan was to use the information that I had been gathering from Mr. Young and Ms. [Katherine] Cross [Young's then-business partner[141]] throughout the pendency of the matters, to use my own knowledge as an attorney working with DNA evidence and, quite frankly, the Cross-Examination of the Commonwealth's expert. That expert gave me almost every piece of evidence and concession that I needed.

\* \* \* \*

Q. Did you have any strategic reason for not challenging the admissibility of some of the DNA opinions under the Pennsylvania *Frye* standard?

A. My opinion was that the DNA evidence was very good for the defense, and my recollection of it is that I wanted it all in. The Commonwealth's expert did her best to color that evidence in the light favorable to the Commonwealth but, frankly, as I said, I think that at the end of the day the DNA evidence was the defense's best exhibits.[142]

Johnson notes that the Commonwealth's expert testified that the only way Talley's DNA would have come to be under Johnson's fingernails was through "more than just casual contact"—rather "some kind of intimate contact."[143] But that testimony was "wrong," in Johnson's formulation, or perhaps just incomplete. In support of that testimony, the Commonwealth's expert cited an article that complicated the unequivocal trial testimony by indicating that such a DNA deposit might also arise where two individuals share accommodations. At the PCRA hearing, the same investigator conceded the point.[144] Penglase evidently did not read this article, and did not cross-examine the expert on this point—this, despite the fact that he indicated that his goal at

---

[141]    Cross testified that she provided no substantive information regarding Johnson's case to Attorney Penglase, and at most offered only general information about DNA testing and analysis. *Id*., 8/9/2023, at 136.

[142]    *Id*., 6/29/2023, at 79-82.

[143]    Johnson's Br. at 68 (quoting N.T.T., 5/29/2015, at 179-80).

[144]    *Id*. at 68-69 (citing N.T.P., 8/10/2023, at 132-33, 144).

trial was "to minimize [the Commonwealth expert's] opinion of intimate versus casual contact."[145]

Johnson argues that the insufficiency of Attorney Penglase's investigation, and his failure to have a DNA expert in the room during the Commonwealth's DNA testimony, lack any reasonable basis. And this is evidenced by the materially undisputed fact that the expert's own cited article undermined the superficial certainty of his testimony, a fact even that expert concedes now. Given that, on his present account, Attorney Penglase's entire strategy for defending against the DNA evidence was to impeach the expert's testimony, his utter failure to prepare to do so effectively was unreasonable.

The result, Johnson argues, was prejudicial. In effect, the Commonwealth's expert's testimony that the only way Talley's DNA could have ended up under Johnson's fingernails was through intimate contact went unrebutted by the compelling evidence that was available to the defense, and, as the principal physical evidence inculpating Johnson, it was critically important to the jury's verdict. The evidence that Johnson had handled the skillet found near Talley's body—the one that investigators speculated had been used to knock out two of Talley's teeth—for want of rebuttal could only have further damaged Johnson's defense. Thus, according to Johnson, there is a reasonable probability that without even that modest amount of physical evidence, the jury would have reached the contrary verdict.

The PCRA court, crediting Attorney Penglase's stated strategy of highlighting the relative *lack* of physical evidence, noted the various potential sources of DNA that did *not* disclose any identifiable trace of Johnson's genetic material. Citing the defense's opening

---

[145]     *Id*. at 72 (quoting N.T.P., 6/29/2023, at 130).

argument, the court observed that Attorney Penglase presented the Commonwealth's own theory of the case—that Talley had struggled with her attacker, clutching and fighting him, and during that struggle the attacker ripped off her wig and do-rag—and noted that the various items associated with that struggle bore none of Johnson's DNA, even though it bore male chromosomal material. "[Talley] probably didn't know she was [d]oing it, but she tried her best to give you evidence of her attacker. She left it in lots of places. None of it belongs to [Johnson]."[146]

The PCRA court noted that there is no obligation to counter expert testimony with countervailing expert testimony if counsel "is able effectively to cross-examine prosecution witnesses and elicit helpful testimony."[147] And the court cited one important instance where Attorney Penglase elicited from a Commonwealth expert that a given result from the scene excluded Johnson, albeit divorced from the context of which item was in question.[148] In another instance, Attorney Penglase elicited an admission that the supposed match with the skillet handle in fact failed definitively to link Johnson to that item.[149] These and other instances, on the PCRA court's account, demonstrated that Attorney Penglase sufficiently cross-examined the Commonwealth's DNA experts without the benefit of a defense expert.

---

[146] PCRA Ct. Op. at 26 (quoting N.T.T., 5/27/2015, at 48).

[147] *Id*. at 27 (quoting *Commonwealth v. Treiber*, 121 A.3d 435, 454 (Pa. 2015)).

[148] *Id*. The evidence under discussion in this instance was a hair recovered from the back of the victim's hand that was determined not to be Talley's own. *See* N.T.T., 5/28/2015, at 105-06.

[149] N.T.T., 5/29/2015, at 191-92.

Regarding prejudice, the PCRA court opined that a defense expert "would have only muddied the waters and confused the jury" to no clear benefit.[150]  Moreover, it is not clear that the defense would have been able to locate an expert witness to testify in effective impeachment of the Commonwealth's evidence.

There is no question that counsel can be deemed ineffective for failing to educate himself with respect to the import and credibility of DNA evidence introduced by the Commonwealth in a criminal trial.  Such evidence is especially potent when it points an accusatory finger at the defendant, which makes it especially important that counsel prepare to meet such evidence armed with whatever means of rebuttal are available.

In *Commonwealth v. Pruitt*, this Court acknowledged the "potency of DNA evidence."[151]  In that case, as here, counsel had failed to rely upon a countervailing expert witness to challenge the Commonwealth's DNA evidence, had materially failed to educate himself on the subject, and, in the words of the appellant in that case, effectively conducted cross-examination "on the fly."[152]  This Court found no prejudice sufficient to sustain an ineffectiveness claim on this basis.  However, in making that determination, we observed that the defendant's "identity as the robber and killer has never seriously been put into contest," and "the fact of [the] crime was apparent from the physical evidence, and [the defendant] ha[d] never provided any plausible explanation that would persuasively suggest any other person's involvement in the relevant events."[153]

---

[150]     PCRA Ct. Op. at 28.

[151]     162 A.3d 394, 401 (Pa. 2017).

[152]     *Id*. at 400.

[153]     *Id*. at 401.

Here, by contrast, identity is central to Johnson's defense, and the DNA evidence in question is the only physical evidence that may tie him to the crime. The very theory that Johnson was a regular in Talley's house suggests that more DNA evidence would have been found than actually was. That said, in this case, for purposes of the present analysis, there also is a jailhouse confession and a damning circumstantial case.

To find prejudice, we must find that, had Attorney Penglase taken the steps Johnson would have had him take, there is a reasonable probability that the verdict would have differed. Given the sum and substance of the non-DNA evidence, we cannot so find. In effect, against a volume of inconclusive and therefore unhelpful evidence to the prosecution—which, as such, arguably was beneficial to the defense—stood one especially problematic finding of Talley's DNA under Johnson's fingernails. We cannot conclude that, without that genetic evidence, the jury was reasonably likely not to convict Johnson.

### 7. Ineffective Assistance, Failure to Introduce Character Evidence

Johnson contends that, in this case, his "reputation for being a peaceful citizen was relevant to the murder charges against him and would have constituted substantive evidence of his innocence of these charges."[154] Characterizing this case as "a close one,"[155] Johnson points to the prosecution's heavy reliance upon Lewis' testimony, infirmities in the evidence of motive, and the absence of incriminating DNA evidence.[156] He underscores that the parties stipulated that several witnesses were available and

---

[154]    Johnson's Br. at 95.

[155]    *Id*.

[156]    *Id*. at 96.

willing to testify as to Johnson's good character and non-violent reputation, including a bishop at Johnson's church and a number of Johnson's close friends.

Evidently taking arguable merit for granted—and we will do the same[157]—Johnson proceeds directly to the question of the reasonableness of counsel's decision not to call character witnesses. Counsel testified that he elected not to do so first because he feared opening the door to incriminating evidence. As well, he avowedly preferred to reserve those witnesses (if necessary) for the penalty phase, and worried that, if he presented them during the guilt phase and the jury found Johnson guilty, the witnesses' credibility would be compromised for the penalty phase.

There is no question that counsel *may* be deemed ineffective for failing to present character witnesses. In *Weiss*, for example, this Court found ineffectiveness for the failure to call such witnesses when the trial evidence was in the nature of he-said / she-said, and the PCRA court determined that there were numerous witnesses who had years of familiarity with the defendant, all of whom would testify to the defendant's good reputation in the community. These circumstances created an "overwhelming need for character evidence," and counsel's "limited investigation into the quantity and/or quality of potential character witnesses on behalf of appellant, and counsel's prejudice toward familial witnesses," as well as his ultimate decision not to call any character witnesses,

---

[157]    *See Commonwealth v. Weiss*, 606 A.2d 439, 442 (Pa. 1992) (holding that, where direct evidence is in short supply, character evidence "is substantive, not mere makeweight evidence," and a claim regarding the failure to present same has arguable merit); *see generally Commonwealth v. Neely*, 561 A.2d 1, 3 (Pa. 1989) (holding that character evidence "may, in and of itself, (by itself or alone) create a reasonable doubt of guilt and, thus, require a verdict of not guilty").

lacked a reasonable basis under the circumstances of that case and prejudiced the defendant at trial.[158]

In rejecting this claim in this case, the PCRA court focused upon what it took to be counsel's reasonable basis for declining to call character witnesses. It underscored that, where character evidence is introduced, it may be rebutted with countervailing evidence regarding the defendant's reputation in the community *or* specific instances of the defendant's conduct that are at odds with his purported reputation.[159] Thus, when counsel has grounds to fear such rebuttal evidence, he "ha[s] an objectively reasonable basis for determining that the evidence would have done more harm than good, [and the] claim fails."[160]

During his PCRA testimony, Attorney Penglase cited this concern.[161] Less convincingly, he also cited his concern that he would risk discrediting character witnesses who might be useful for mitigation purposes during the penalty phase, if Johnson was found guilty of the alleged murders.[162] But his concern for rebuttal evidence appears valid on the record. For example, Hawke testified during the PCRA hearing that he had interviewed Coles before trial, who indicated that Johnson had committed armed robberies around the Avalon Court Area.[163] As noted above, Coles, Talley's cousin and

---

[158]    *Weiss*, 606 A.2d at 443.

[159]    PCRA Ct. Op. at 48.

[160]    *Id*. (quoting *Commonwealth v. Busanet*, 817 A.2d 1060, 1070 (Pa. 2002)).

[161]    *Id*. at 48-49 (citing N.T.P., 6/29/2023, at 134-35).

[162]    *Id*. at 49.

[163]    N.T.P., 6/29/2023, at 20.

Johnson's friend, appeared at trial as a witness for the prosecution, whom Johnson called several times the afternoon of the killings.[164]

While counsel may be deemed ineffective for failing to present character evidence, we find few instances in which this Court has granted relief on that basis; Johnson cites only *Weiss*. The attorney in *Weiss* was far more neglectful of the prospective benefit of investigating and calling available character witnesses in that case. As well, the potential benefit of character testimony appears to have been greater there than in this case. Where an impeccable reputation in the community may well be a dispositive factor in a he-said/she-sexual assault case like *Weiss*, here it is less clear how even the most positive of community reputations might have played against Lewis' testimony and/or with the circumstantial evidence of Johnson's guilt. And there is evidence that his reputation was not impeccable or irrebuttable in any event.

Ultimately, albeit with ongoing reservations about the rigor of Attorney Penglase's investigatory efforts, we cannot conclude that he lacked a reasonable basis for declining to present character witnesses. Moreover, even if we found fault in his decision, we would be hard pressed to find prejudice in it. Having a good reputation in the community would not change the fact of Johnson's conduct during the afternoon and evening of the day in question, from his reckless flight to the instability of the stories he told investigators. And it is unlikely that it would fatally undermine the combination of Johnson's putative confession, the presence of Talley's DNA under his nails, and the evidence exhibiting his consciousness of guilt.

---

[164] *See generally* N.T.T., 5/28/2015, at 245-68.

### 8. Ineffective Assistance, Cumulative Prejudice

We have found that each of the foregoing ineffective assistance claims by itself does not undermines confidence in the verdict or create a reasonable probability that a jury would have reached a different result. However, where numerous ineffective assistance claims fail for want of prejudice, we must consider their cumulative prejudicial effect before we reject the claims *in toto*.[165]

Our misgivings regarding Attorney Penglase's investigative diligence give us pause. In his PCRA testimony, Attorney Penglase conceded an alarming number of the deficiencies that Johnson identified, and not infrequently conceded that he lacked a reasonable basis for his decisions. It appears to us that, even granting Attorney Penglase the assumption that his decisions were considered at the time they were made, time after time his review led him to the conclusion that little or no investigation was called for.

We cannot gainsay the difficulties this presents. Counterposed against a compelling circumstantial case for Johnson's guilt, we nonetheless must acknowledge that the only direct evidence of Johnson's guilt came in the form of an inherently suspect, and only modestly tested, report of a jailhouse confession. We also have what appears to be a pervasive pattern of deficiencies in trial counsel's investigation and preparation for Johnson's guilt-phase trial—not just as to Lewis, but as to the quality and rigor of the Commonwealth's investigation and counsel's failure to fully test the DNA evidence that,

---

[165] *See Spotz*, 18 A.3d at 321. Because this applies only to claims that fail for want of prejudice, we will not consider the alleged ineffectiveness for failing to present character evidence, which we have determined failed because counsel had a reasonable basis for declining to present such evidence.

to a limited but not negligible extent, tied Johnson to some physical encounter with the victim.  We have on occasion granted relief for deficiencies in trial preparation like these.

But while we must consider the prejudice occasioned by these shortcomings cumulatively, our inquiry is probabilistic, and "[a] defendant is entitled to a fair trial, not a perfect one."[166]  We have little difficulty anticipating a guilty verdict despite Attorney Penglase's alleged deficiencies with respect to his investigation and impeachment of either of George Lewis or Marquis Johnson standing alone, or with regard (standing alone) to the apparent weakness of his treatment of the Commonwealth's DNA evidence.  It is with great misgivings that we can implicitly bless legal representation that seemed often to select the least burdensome option, venturing only a handful of *post hoc* rationalizations for the investigated avenues untraveled.

Nonetheless, we must not allow our discomfiture to overwhelm our reticence to second-guess counsel's decisions, let alone to overturn a jury's verdicts of guilt of three homicides.  Nor can it eclipse what we have underscored is a strong circumstantial case against Johnson.

On balance, the strength of the circumstantial case must prevail over the several weaknesses in Attorney Penglase's efforts on Johnson's behalf.  In several instances where counsel lacked a reasonable basis for his chosen course, the resultant prejudice is not enough to overcome the undisturbed evidence of guilt.  Accordingly, we find no grounds for relief from the guilt-phase verdict rendered by the jury, and we proceed to consider the penalty-phase issues that Johnson raises.

---

[166]    *See Commonwealth v. Wright*, 961 A.2d 119, 135 (Pa. 2008).

## V. Penalty Phase

### A. Aggravators and Mitigators and the Standard of Review

Capital sentencing is governed by statute. 42 Pa.C.S. § 9711 provides for what amounts to a second trial in which the jury determines whether the circumstances of a first-degree murder warrant imposition of the death penalty. In the course of that trial, the prosecution introduces some number of enumerated aggravating circumstances and the defense counters with evidence of mitigating circumstances. A lengthy and exclusive list of eighteen aggravating circumstances is provided in Section 9711(d). A less lengthy list of mitigating circumstances is provided for in Section 9711(e).

The jury is instructed on all aggravating and mitigating circumstances as to which there is some competent evidence. Aggravating circumstances must be proved beyond a reasonable doubt, while mitigating circumstances need be proved only by a preponderance of the evidence. The jury may impose the death penalty only upon unanimous accord. But it is instructed that it *must* impose the death penalty if (a) it finds at least one statutory aggravator and no statutory mitigators *or* (b) it finds at least one of each and concludes that the aggravating circumstances outweigh the mitigating circumstances.[167] In this case, the jury unanimously found that the aggravating factors in Sections 9711(d)(5), (11), and (16) outweighed the mitigating factors found in Sections 9711(e)(1), (4), and (8).[168] The jury did *not* find that Johnson "was under the influence of

---

[167]    *See generally* 42 Pa.C.S. § 9711(c).

[168]    Respectively, the enumerated aggravating circumstances were that the victim (R.R.) was a prosecution witness to the murder of Talley; the victim was convicted of another murder (Talley); and the victim was a child under twelve years of age. Respectively, the mitigating factors were that the defendant had no significant prior criminal history; the defendant's young age; and the "catch-all mitigator," which applies to (continued…)

extreme mental or emotional disturbance" at the time of the killings, a mitigator that Johnson sought to establish through evidence of his "traumatic upbringing and serious mental health impairments."[169]

To reiterate before we take up our discussion, on review of an order denying relief under the PCRA, this Court reviews the PCRA court's decision for an error of law or an abuse of discretion. This Court further is bound by any findings of fact that are supported by the PCRA record, viewed in the light most favorable to the prevailing party.[170]

**B. Ineffective Assistance, Failure to Resist Exclusion of Mitigating Evidence**

Johnson argues that the trial court erred in excluding what he describes as "mitigating evidence of [Johnson's] multigenerational history of trauma and mental illness and the effects of [Johnson's] brain damage on his emotional and mental development."[171] As an example of the former, he notes that the trial court restrained mitigation expert Carol Krych from testifying as to any evidence of generational trauma that Johnson, himself, did not experience. In Johnson's opinion, this precluded Krych from testifying regarding precisely the information she and other mitigation experts rely upon in formulating their opinions. Genetics and environment are important factors in mental and emotional development and the diagnosis of mental illness. Similarly, the court precluded neuropsychologist Dr. Carol Armstrong from "testifying about how

---

"[a]ny other [unenumerated] evidence of mitigation concerning the character and record of the defendant and the circumstances of his offense." 42 Pa.C.S. § 9711(e)(8).

[169]    Johnson's Br. at 100 (quoting 42 Pa.C.S. § 9711(e)(2)).

[170]    *See Spotz*, 84 A.3d at 311.

[171]    Johnson's Br. at 123.

[Johnson's] deficits in executive functioning impacted his behavior."[172]  As evidence of the trial court's "reprimanding" tone in rejecting Dr. Armstrong's testimony, he cites two incidents in which the court pointedly instructed Dr. Armstrong to answer the question posed.[173]  Johnson also argues that the trial judge's allegedly intemperate trial demeanor during sentencing reflected a lack of impartiality.  On Johnson's account, the court "openly criticized [Krych's and Dr. Armstrong's] testimony and implied that their credibility was suspect."[174]  As stand-alone issues, these either were or could have been litigated on direct appeal.  Accordingly, we may not consider them on their own terms on collateral review.[175]

But Johnson also seeks to frame this as an ineffectiveness claim.  Specifically, he argues that Attorney Fioravanti was ineffective for failing to object to the limitations the court imposed upon Dr. Armstrong's testimony.  Similarly, counsel was ineffective for not objecting to the suggestions of partiality that met Krych's and Dr. Armstrong's testimony.  Counsel raised the issue on direct appeal, Johnson concedes, but on his account appellate counsel Attorney Fioravanti's appellate argument was enfeebled by a lack of

---

[172]    *Id*. at 125.

[173]    *See id*.

[174]    *Id*. at 126.

[175]    *See* 42 Pa.C.S. § 9543(a)(3) (providing that eligibility for PCRA relief is unavailable when the issue has been "previously litigated or waived"); *id*. § 9544 (providing that an issue has been previously litigated if "the highest appellate court in which the petitioner could have had review as a matter of right has ruled on the merits of the issue," and that it is waived "if the petitioner could have raised it but failed to do so before trial, at trial, during unitary review, on appeal or in a prior state postconviction proceeding"); *see generally Commonwealth v. Vandivner*, 130 A.3d 676, 683 (Pa. 2015) (PCRA claim properly denied where it had been litigated on direct appeal).

examination of binding precedent in favor of a broader understanding of the scope of mitigating evidence that is relevant in capital sentencing proceedings.

Johnson's argument as to this issue is perplexing. Asserting first that "[c]ounsel posed no objection at trial to the limitation on Dr. Armstrong's testimony,"[176] he goes on to acknowledge that counsel did object to limitations on Krych's testimony, but contends that Attorney Fioravanti was ineffective for *how* he objected, failing to cite any applicable law at the time of the objection. He then acknowledges that Attorney Fioravanti raised the underlying evidentiary issue on direct appeal to this Court, and that this court considered and rejected it, but faults the way in which Attorney Fioravanti argued the issue. Ultimately, we find Johnson's arguments as to Attorney Fioravanti's alleged deficiencies at trial and on appeal too vague to credit or treat as a basis for relief, and Johnson's perfunctory claims of prejudice wholly unconvincing. The jury was given ample evidence of the regrettable circumstances of Johnson's upbringing and was unpersuaded that he had established the Section 9711(e)(2) mitigator.

Accordingly, Johnson's allegations of Attorney Fioravanti's ineffectiveness at trial and on appeal with respect to these evidentiary questions fail.

## C. Ineffective Assistance, Failure to Develop Mitigating Evidence

Johnson also argues that Attorney Fioravanti constitutionally was ineffective for failing adequately to develop mitigation evidence in advance of sentencing, particularly as to the Section 9711(e)(2) mitigator (defendant "under the influence of extreme mental or emotional disturbance"). He notes that the defense relied exclusively upon the testimony of Dr. Armstrong, a neuropsychologist, and Dr. Steven Berkowitz, a

---

[176] Johnson's Br. at 127.

psychiatrist. On Johnson's account, Attorney Fioravanti knew that the prosecution would rely in rebuttal upon the report of John O'Brien, M.D., but failed either to obtain or perhaps seek to preclude Dr. O'Brien's report because the defense experts were given insufficient time to prepare to meet the report. Regarding Dr. O'Brien's report, it allegedly was provided on June 5, 2015, the day after penalty proceedings commenced and after Dr. Armstrong already had testified. Johnson also contends that Attorney Fioravanti categorically failed to investigate and present family witnesses to a legacy of family trauma, who have declared in connection with these proceedings that they were available and would have testified if asked.

Dr. Armstrong testified that Johnson had various impairments that interfered with his availability to learn from social cues.[177] She testified that childhood trauma had caused him brain damage, and a person with his impairments could not live a normal life.[178] Dr. Berkowitz testified that Johnson met nine of ten factors provided for by the Adverse Childhood Experiences ("ACE") study.[179] High ACE scores are associated with a heightened risk of poor physical and mental health and increased criminal behavior.[180] Dr. Berkowitz also testified that Johnson suffered from bipolar disorder, and this, combined with his childhood trauma, affected brain development and made him more impulsive.[181]

---

[177]   N.T.T., 6/4/2015, at 132.

[178]   *Id*. at 140-41.

[179]   *Id*., 6/5/2015, at 206.

[180]   *Id*. at 205.

[181]   *Id*. at 207, 212, 223.

Dr. O'Brien attacked the bipolar diagnosis and the conclusion that Johnson suffered from any brain damage. Indeed, he challenged the proposition that childhood trauma can cause brain damage at all.[182] According to Johnson, on cross-examination, Attorney Fioravanti failed entirely to address Dr. O'Brien's rejection of the bipolar disorder and simply elicited that Dr. O'Brien was not a neuropsychologist.[183]

As noted, Attorney Fioravanti retained Krych, a seasoned mitigation specialist, to assist in gathering records and preparing a life history. He was sufficiently aware of the sheer volume of potential evidence that the defense sought a continuance of the trial to conduct a thorough investigation. Most of Johnson's extended family lived in Georgia, but counsel delayed until only weeks before the delayed trial commenced to seek funding for travel to investigate those potential witnesses. On Johnson's account, Krych deemed it important to establish a multigenerational history of family dysfunction and of mental disorders that may be hereditary.

In particular, Krych believed that Johnson's aunt, Regina Baskett, would be a strong mitigation witness. But Attorney Fioravanti made only minimal effort to secure her attendance at trial and never advised the trial court that he was encountering difficulty in that endeavor. As well, of Johnson's six siblings, two of whom were juveniles, counsel spoke with Marquis and Mitchell, but Marquis was a witness for the prosecution and

---

[182]    *Id.*, 6/8/2015, at 87-89.

[183]    This is, to say the least, a parsimonious account of Attorney Fioravanti's cross-examination of Dr. O'Brien, which elicited significantly more information designed to undercut Dr. O'Brien's bases for disagreeing with Drs. Armstrong and Berkowitz. *See* N.T.T., 6/8/2015, at 101-13.

counsel was aware that Mitchell would be unavailable for trial. A third brother, Montel, was on parole, but counsel made no effort to track him down.

For purposes of this appeal, we are limited to consider what Johnson highlights. To that end, we will consider only the failure to secure Baskett's and Montel's testimonies. In Baskett's PCRA declaration, she indicated that Johnson grew up in squalor and was subject to regular physical and mental abuse at the hands of his parents.[184] Montel, too, attested that he was witness (and party) to the severe childhood abuse inflicted upon Johnson at home.[185] This evidence cannot be mistaken for the remote proposed mitigating evidence the exclusion of which this Court affirmed on direct appeal.[186] Which is to say, even on the trial court's own terms, this presumably would (or at least should) have been treated as relevant evidence.

This makes it problematic that counsel failed fully to explore these avenues and seek to present these witnesses at trial. Montel attested that he lived in Philadelphia at the time of Johnson's trial and would have made himself available if asked.

The PCRA court was unpersuaded. It cited the United States Supreme Court for the proposition that "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation."[187] The court must "apply[] a heavy measure of deference to

---

[184]    *See* Decl. of Regina Baskett, 5/15/2019, at ¶¶ 28-31, PCRA App. at 00462-63.

[185]    *See*, *e.g.*, N.T.P., 8/9/2023, at 188-201.

[186]    As noted, that subject is waived as previously litigated, and ineffectiveness will not lie for failing to investigate or present evidence that the court deemed inadmissible.

[187]    PCRA Ct. Op. at 51 (quoting *Strickland*, 466 U.S. at 691).

counsel's judgments."[188] This Court has elaborated to similar effect specifically in the context of investigations in furtherance of mitigation in capital cases.[189] "Where, as here, the jury finds both aggravating and mitigating factors," the PCRA court continued, "'the prejudice inquiry considers whether there is a reasonable probability that, had the PCRA evidence been adduced at the penalty phase at least one juror would have concluded that the mitigating circumstances collectively outweighed the aggravating ones.'"[190]

Contrary to Johnson's present characterization, the PCRA court cited Attorney Fioravanti's testimony that he had pursued mitigation evidence at some length and had run into a wall. He testified that he felt as though he had "exhausted" his avenues. Neither of Johnson's (allegedly abusive) mother or stepfather would cooperate, and on counsel's account, the brothers had come to a dead end. He also came to the conclusion that traveling to Georgia wouldn't change "what we already had."[191]

On the PCRA court's account, this established that counsel's "investigation was not only reasonable, but was thorough and complete."[192] In lieu of more direct witnesses to Johnson's allegedly abusive, traumatizing childhood, the court allowed Krych to read directly from her detailed mitigation report, and that was the only available way Attorney Fioravanti could present to the jury the aforesaid history. Regarding the allegedly compromised opportunity to rebut Dr. O'Brien's testimony, the court opined that Attorney

---

[188]   *Id*. (quoting *Strickland*, 466 U.S. at 691).

[189]   *See Commonwealth v. Brown*, 196 A.3d 130, 151 (Pa. 2018).

[190]   PCRA Ct. Op. at 51-52 (quoting *Commonwealth v. Daniels*, 104 A.3d 267, 297 (Pa. 2014)).

[191]   N.T.P., 8/10/2023, at 44-45.

[192]   PCRA Ct. Op. at 52.

Fioravanti "effectively cross-examined the Commonwealth's expert witness on his lack of expertise in specific areas important to Trial Counsel's arguments."[193]

For these reasons, the court declined to find the degree of Attorney Fioravanti's investigation constitutionally defective, and it hinted at the conclusion that any such deficiency had caused insufficient prejudice to warrant relief.

The PCRA court's finding of reasonableness is, itself, reasonable and supported by the record. Notwithstanding counsel's indication that he would have used Baskett's testimony if he had the opportunity, it is not clear on the PCRA court's assessment that the opportunity was there, given the limited evidence that she was available and would have testified at the time. As for prejudice, as we have noted herein, Johnson is entitled to a fair trial, not a perfect trial. Here, mitigating and aggravating factors were determined based upon a combination of the facts of the underlying crimes as found by the jury and a conventional battle of experts primarily regarding Johnson's mental health, as anticipated and enriched by Krych's detailed account of his history of abuse and family trauma. Prejudice must be assessed in light of the numerous aggravators that the jury found, and we simply do not find that any modest deficiency in counsel's investigation creates a reasonable probability of a divergent outcome in sentencing. Accordingly, this issue fails.

### D. Ineffective Assistance, Failure to Challenge Witness-Killing Aggravator

Johnson would have had trial and appellate counsel argue that Lewis' testimony alone, as the sole evidence that Johnson killed R.R. to silence her as a witness who could identify him as Talley's killer, "did not meet the reliability requirement necessary to

---

[193] *Id.* at 53-54.

establish the [corresponding] aggravating circumstance" found at 42 Pa.C.S. § 9711(d)(5) "where, as here there was no pending prosecution at the time of the killing."[194] By way of arguable merit, Johnson notes that the aggravator on its face suggests that it applies only where the victim was established as a prosecution witness, and he cites this Court's decision to that effect in *Commonwealth v. Crawley*.[195] But Johnson also acknowledges that we effectively nullified that narrow holding in *Commonwealth v. Appel*, decided the following year, holding that the Section 9711(d)(5) aggravator *could* apply to the killing of a *potential* witness.[196] In *Appel*, Johnson acknowledges, we held that with direct evidence of the intention to silence a witness to a crime, it is unnecessary that the witness be part of a pending prosecution, as such.

Here, however, he argues that the direct evidence is insufficiently credible, because the direct evidence was Lewis' testimony regarding Johnson's alleged prison confession. Citing former Chief Justice Saylor's stated skepticism of jailhouse informants, Johnson argues that Lewis' testimony simply wasn't enough—evidently because, whether the evidence he offered was "direct" or not, it was inherently incredible. [197]

Aside from the subjective comments of one Justice, albeit as fortified by a modicum of common sense, the simple fact is that *Appel* opened the door to the sort of evidence

---

[194]    Johnson's Br. at 132.

[195]    526 A.2d 334 (Pa. 1987).

[196]    539 A.2d 780 (Pa. 1988).

[197]    *See* Johnson's Br. at 134; *Commonwealth v. Crispell*, 193 A.3d 919, 956 n.2 (Pa. 2018) (Saylor, J., concurring) ("I take this opportunity to note my agreement with those jurisdiction which have found [jailhouse informant] testimony to be 'inherently suspect.'" (citation omitted)); *cf. Commonwealth v. Dowling*, 316 A.3d 32, 49 (Pa. 2024) (conceding "that there is a reasonable debate to be had concerning the reliability of jailhouse informant testimony").

of the intent to silence a witness that was proffered in this case.  The jury was entitled to credit that testimony.  For those reasons alone, we find no arguable merit to Johnson's claim.

Moreover, if we found arguable merit, and found no reasonable basis for counsel not to raise the objection to the reliability of a jailhouse informant's testimony that Johnson believes was warranted at trial and on appeal, we nonetheless would find no prejudice. In order to find prejudice in this context, we must discern "a reasonable probability that, had the PCRA evidence been adduced at the penalty phase"—or, here, used to impeach Lewis' trial testimony—"at least one juror would have concluded that the mitigating circumstances collectively outweighed the aggravating ones."[198]  We find no such probability even if, as Justice Donohue hypothesizes, Lewis's testimony was categorically discredited by at least one juror.[199]  It is true that, had the impeachment had the desired effect, it would have reduced the aggravators found unanimously from three to two, for want of direct evidence of the Section 9711(d)(5) witness-killing aggravator (which, as noted above, must be proved beyond a reasonable doubt by direct evidence).  And we acknowledge that there is some appeal to treating the fact that (in that scenario) the statutory mitigators would outnumber the statutory aggravators as dispositive in Johnson's favor.  But no case law suggests that the analysis is a counting exercise. Section 9711(d)(5) was but one of three aggravators in a multiple-murder case, and one of the remaining aggravators was for the killing of a victim under twelve years old, the

---

[198]     *Daniels*, 104 A.3d at 297.

[199]     *See* Diss. Op. at 12 (Donohue, J.) (finding "a reasonable possibility that one or more of the jurors would have found that Lewis's testimony was not credible").

putative witness in question. We cannot deem it reasonably probable, in light of the two other aggravators found by the jury, that one or more members of the jury would have retreated from imposing a death sentence under these circumstances. Accordingly, this claim fails.[200]

**E. Failure to Provide the Jury with a "*Simmons* Instruction"**

In *Simmons v. South Carolina*, during closing argument in a capital case, the prosecution "raised the specter of petitioner's future dangerousness generally, but then

---

[200] Justice Donohue criticizes us for acting as a "super jury" that has failed to engage in the weighing process prescribed by *Daniels*. Diss. Op. at 11-12 n.8 (Donohue, J.). That is an odd criticism, as it fails to explain how we can at the same time have transgressed by acting "super"-deliberatively and by failing to deliberate. In any event, *Daniels requires* a degree of difficult speculation on this Court's part regarding how a jury would review the evidence remaining in light of changes imposed on appeal, a "task of reweighing" that "is not an exact science." *See Daniels*, 104 A.3d at 304. Were it not so, the law would provide that, in any circumstance in which an aggravator is removed from the calculus, the case must be remanded for a new sentencing proceeding. For his part, Justice McCaffery asserts that "little speculation is needed where, as here, the jury found multiple mitigating circumstances and its final moral judgment included an improper aggravator." Conc. & Diss. Op. at 9 (McCaffery, J.). But he also engages in his own critical speculation. For example, based upon what seem to be mechanistic assumptions about the jury, Justice McCaffery writes the multiple-murder aggravator out of the verdict. In his view, the fact that the jury declined to impose the death penalty for Talley's murder—implicitly finding that aggravator alone insufficient as to Talley—necessarily means that the jury could not have relied upon that aggravator at all in imposing the death penalty for R.R.'s murder. *See* Conc. & Diss. Op. at 10-11 (McCaffery, J.). This bald inference excludes any number of alternate explanations for the jury's divergent sentencing choices between the two victims. That the multiple-murder aggravator was not enough to impose death for Talley's murder hardly excludes the prospect that it was deemed sufficient for R.R when combined with the victim-under-twelve aggravator. Indeed, the distinction between the sentence imposed for Talley's murder and that imposed for R.R.'s murder suggests that the jury made far *more* of the victim-under-twelve aggravator than Justice McCaffery thinks it did. Ultimately, the jury is a black box; we can only (but must) speculate as to its contents. We have reviewed the evidence in aggravation and mitigation, taking careful account of what we can glean from the jury's consideration of that evidence, as reflected in the aggravators and mitigators the jury properly found and in its verdict. Under the circumstances presented, we are not prepared to second-guess the jury's conclusion.

thwarted all efforts by petitioner to demonstrate that, contrary to the prosecutor's intimations, [the petitioner] never would be released on parole and thus, in his view, would not pose a future danger to society."[201]  The United States Supreme Court held that, when a prosecutor raises future dangerousness, the defendant may seek a jury instruction to the effect that a sentence of life in prison without the possibility of parole means exactly that.  As this Court explained in *Spotz*, evidence of future dangerousness sufficient to trigger *Simmons* protections "is evidence with a tendency to prove dangerousness in the future."[202]

Johnson's arguments on this issue fail for a number of reasons.  First, to the extent that it is framed outside the context of ineffective assistance of counsel, it could have been pursued on direct appeal.  Thus, as a stand-alone issue, it is waived under the PCRA.

Recognizing this fact, Johnson primarily argues this as an ineffective assistance of appellate counsel claim.  The difficulty, here, is that this Court has hewed to the United States Supreme Court's line that such an instruction is required only where future dangerousness is put at issue by the prosecution.  Johnson cites no instance in which the Commonwealth put future dangerousness at issue.  And he cites nothing to suggest that appellate counsel acted unreasonably in deciding not to appeal the trial court's rejection of trial counsel's effort to elicit a *Simmons* instruction, nor any indication of prejudice in the form of authority compelling relief on appeal.  The law entitles him to no such argument or instruction.

---

[201]    512 U.S. 154, 165 (1994) (footnote omitted).

[202]    896 A.2d at 1245 (quoting *Kelly v. South Carolina*, 534 U.S. 246, 254 (2002)).

Even if we credit this issue as having arguable merit, we must confront the conclusory nature of Johnson's argument, which comprises barely over one page.[203] Merely asserting the lack of a reasonable basis for declining to pursue this issue on appeal and baldly insisting that the decision was prejudicial is insufficient in any case to secure relief. None is due here. Direct appellate counsel was not ineffective in declining to pursue the *Simmons* issue.

## VI. Failure to Recuse

On March 23, 2023, the PCRA court signaled to the parties that ADA Weintraub was running to be a judge on the Court of Common Pleas of Bucks County, evidently unopposed. The court suggested then that ADA Weintraub's presumptive successful election to the court would likely cause a conflict of interest, and indicated that it would therefore seek to conduct an evidentiary hearing and decide Johnson's PCRA petition before ADA Weintraub could be sworn in. On April 4, 2023, noting that he intended to call into question ADA Weintraub's "credibility and integrity," Johnson filed a motion to recuse the entire Bucks County Court of Common Pleas. The PCRA court found no conflict because it intended to rule on the PCRA petition before any swearing-in could occur—and it followed through on that promise, denying relief in a December 29, 2023 order.[204]

As our Superior Court aptly has explained:

As our Judicial Code dictates, "[a] judge shall not permit family, social, political, financial, or other interests or relationships to influence the judge's

---

[203] Johnson's Br. at 130-31.

[204] Ultimately, though, ADA Weintraub was sworn in and became Judge Weintraub several months before the PCRA court issued its Pa.R.A.P. 1925(a) opinion in support of its ruling in April of 2024.

judicial conduct or judgment." Pa. Code of Judicial Conduct, Cannon 2.4(A). Thus, we assume that a jurist will possess interests and relationships that might conceivably influence their judgment but, in the normal course of events, the mere presence of an interest or relationship that could theoretically affect a judicial decision does not create a presumption of partiality.

Rather, "[r]ecusal is required wherever there is substantial doubt as to the jurist's ability to preside impartially." *In the Interest of McFall*, 617 A.2d 707, 713 (Pa. 1992). "A jurist's impartiality is called into question whenever there are factors or circumstances that may reasonably question the jurist's impartiality in the matter." *Id.* Thus, "[i]n order for the integrity of the judiciary to be compromised, we have held that a judge's behavior is not required to rise to a level of actual prejudice, but the appearance of impropriety is sufficient." *Id.* at 712. In this regard, the appearance of impropriety sufficient to disqualify a judge exists when "a significant minority of the lay community could reasonably question the court's impartiality." *Commonwealth v. Bryant*, 476 A.2d 422, 426 (Pa. Super. 1984) (quoting *Commonwealth v. Darush*, 459 A.2d 727, 732 (Pa. 1983)).[205]

We review the denial of a motion to recuse for an abuse of discretion.[206] "An abuse of discretion is not merely an error of judgment, but occurs only where the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill will, as shown by the evidence of record."[207] In so doing, we "presume[] judges are fair and competent."[208]

Noting what he asserts to be a lack of distinction between a prosecutor in the process of running unopposed for a seat on the Court of Common Pleas and one who has been sworn in to such a position, Johnson insists that the PCRA court in this case could not pass upon the aspersions Johnson cast upon ADA Weintraub's integrity when

---

[205] *Commonwealth v. Dip*, 221 A.3d 201, 206-07 (Pa. Super. 2019) (citations modified; emphasis omitted).

[206] *Lomas v. Kravitz*, 170 A.3d 380, 389 (Pa. 2017).

[207] *Id*.

[208] *In re Lukuta*, 11 A.3d 427, 435 (Pa. 2011).

ADA Weintraub was, or was about to become, "a colleague on the bench."[209] Notably absent from Johnson's presentation is any concrete evidence of the court's bias or special solicitude toward ADA Weintraub. Also missing is any case law suggesting that a given court cannot pass on cases under the management of attorneys who are also candidates to become a judge in that or any other court. Most judicial candidates practice while they run, and most run in jurisdictions where they practice. The difficulty in requiring recusal in all or most such situations is obvious. And nothing in the law cited by Johnson suggests that, under these circumstances, the court's assurances of impartiality[210] cannot be trusted. It is simply not clear that "a significant minority of the lay community could reasonably question the court's impartiality"[211] under the circumstances presented.

Bearing in mind our deference to a judge's assurances of his or her ability to rule impartially, as well as our prescribed presumption of fairness and competence, we find no abuse of discretion in the PCRA judge's refusal to recuse from this case. Thus, we affirm the PCRA court's decision not to recuse.

## VII. Cumulative Prejudice

As discussed and considered in connection with the guilt-phase assessment of various claims of ineffective assistance of counsel, where multiple claims of ineffective

---

[209] Johnson's Br. at 138.

[210] The PCRA court thoroughly and convincingly explained its reasoning for denying recusal in open court. *See* PCRA Ct. Op. at 79-80 (quoting N.T.P., 6/28/2023, at 9-12). In doing so, the judge noted that he had already been assigned this case in the wake of the trial judge's recusal, and cited the considerable time and effort that had gone into the PCRA proceedings to that point, at least some of which would have to be duplicated before a newly assigned judge.

[211] *Dip*, 221 A.3d at 206-07.

assistance fail for want of sufficient prejudice, this Court may assess the prejudice of those errors cumulatively in order to determine whether the petitioner has been denied due process. In a parting section, though, Johnson seeks to expand this to consideration of prejudice arising from *Brady* violations and others—and to the putative accumulation of errors asserted in both the guilt-phase and penalty-phase as one body.

But even granting this heuristic—which we historically have allowed only in the context of ineffectiveness claims, as set forth above—Johnson cannot succeed. A great deal of his challenge to this case hinges in various ways upon his discomfiture with the degree of Lewis' contribution to the verdict and, putatively, to the imposition of a death sentence. But as we have related, it is less than reasonably probable that, even if certain *Brady* disclosures had been made, and even if guilt-phase counsel had been more effective in digging up impeachment evidence and using it against Lewis at trial, the jury would have reached a different result. Whether because the circumstantial case was sufficient in itself or because the jury could have credited Lewis in any event, the result of both phases of trial likely would have been the same. Consequently, even viewing the assertions of error in sum, and even allowing that we find troubling that Johnson's trial attorneys elected not to travel various potential avenues of inquiry, we discern no reasonable probability that the jury would have reached different verdicts in either phase in this case.

### VIII. Conclusion

Attorneys who defend capital cases undertake a solemn obligation. And as set forth above, at the heart of the obligation lies the imperative to conduct thorough investigations at each phase of a capital prosecution to ensure that all avenues for testing

the Commonwealth's case for guilt and meeting its claimed aggravating factors with available mitigating evidence are thoroughly explored. In this case, Johnson has raised valid questions concerning the thoroughness of both of his attorneys' preparations in this case. That being said, in some instances there have been at least plausibly reasonable bases for counsel's omissions, and in all instances the evidence that defense counsel could have done very little to assail painted a damning picture of Johnson's guilt, one that preserves our confidence in the ultimate verdict.

Primarily because we find that the various arguable deficiencies raised on appeal did not prejudice the verdict, and for all the other reasons stated herein, we affirm the PCRA court's order denying Johnson's petition for collateral relief.

Chief Justice Todd and Justices Dougherty, Mundy and Brobson join the opinion.

Justice McCaffery files a concurring and dissenting opinion.

Justice Donohue files a dissenting opinion in which Justice McCaffery joins.